231 N.J. Super. 34 (1989)
554 A.2d 1356
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MARLO GUNTER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 10, 1989.
Decided February 22, 1989.
*35 Before Judges PRESSLER, SCALERA and STERN.
Willard E. Byer, Jr., Designated Attorney, argued the cause for appellant (Alfred A. Slocum, Public Defender, attorney).
*36 Marijean Raffetto Stevens, Deputy Attorney General, argued the cause for respondent (Cary Edwards, Attorney General, attorney).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The significant issue raised by this appeal is the admissibility under Evid.R. 56(2) of expert testimony by a psychologist explaining in general terms the factors which affect the reliability of eyewitness identification. Although this question has been considered within the last several years by a number of state and federal courts, it has not yet been addressed in this jurisdiction in a reported opinion. Having considered the record in this case, the literature and the judicial views expressed elsewhere, we have concluded that the question of the admissibility of the evidence proffered here could only have been resolved by a hearing under Evid.R. 8 to determine its scientific reliability and the extent to which, if at all, it would have assisted the jury in its understanding of relevant matters beyond the common knowledge of human experience. No such hearing was held here, and we consequently remand so that one may now be conducted.
Defendant Marlo Gunter was charged with a series of related crimes arising out of the armed holdup of a McDonald's restaurant, including robbery in the first degree, N.J.S.A. 2C:15-1; aggravated assault, N.J.S.A. 2C:12-1(b)(4); and possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4. Following a trial by jury, he was convicted of all three charges. He was sentenced on the robbery conviction to a 20-year term subject to a 7-1/2 year parole ineligibility to be served consecutively to a 56-year term imposed by a New York court. The sentences on the other two convictions, 18 months subject to an 18-month parole ineligibility period and 7 years subject to a 3-1/2 year parole ineligibility period, respectively, are to be served concurrently with the armed robbery sentence.
*37 According to the State's proofs, at 11:00 p.m. on the night of May 18, 1983, two masked robbers entered a McDonald's restaurant in Sussex County, New Jersey, just as its manager, David Myers, was in the process of locking up. The only other occupants of the restaurant were three other employees who were performing their regular closing-up chores. One of the intruders herded those three into the walk-in freezer. That assailant was not seen again by Myers and was never identified by any of the four. The other assailant, brandishing a small-caliber pistol, walked Myers to his desk and demanded that Myers get a bag and put money into it. Apparently, the assailant was not able to see what Myers was doing and could not see well enough to fill the bag himself. He therefore pushed the stocking-mask covering his face up to his hairline. When he saw Myers then looking at his face, he struck him across the nose with the pistol, causing rather profuse bleeding. The assailant then left his face exposed until he had gotten all the money and had brought Myers into the freezer with the others. According to Myers, during this entire time the assailant continued to point the pistol at him. The four employees remained in the freezer for about 25 minutes and then telephoned the police. Myers, the only one who could make an identification and only of the one assailant whose face he had seen, gave the police a general physical description of the assailant.
Within the next week or so, Myers, according to his testimony, was shown three separate photographic arrays on three separate occasions, the first consisting of a group of 35 to 40 photographs, the second a group of about 15 photographs, and the third a group of six photographs. All of the arrays were brought to him at the restaurant while he was working. He identified none out of the first group. Out of the second group he chose two, possibly three, which he thought looked like the assailant. Out of the last group, he made a positive identification of defendant. The officer who conducted the photo arrays, State Trooper Emma, had no knowledge, recollection or record *38 notation of the first array and opined that some other officer may have conducted it.
With respect to the 15-photograph array, Emma testified that it included two or three four-year old pictures of defendant. The New Jersey police had been supplied with these photographs by New York police, who had arrested defendant several days after the McDonald's robbery as he and another were apparently fleeing in a borrowed car from a fast-food restaurant in Rockland County, New York, which had been held up by two masked armed men. According to Emma, those photographs of defendant were not the same as each other. Also according to Emma, he did not tell Myers that the photographs he had tentatively identified in that array were those of the police suspect. Myers also so testified. Within several days after that array, Emma obtained from the New York police a current photograph of defendant which was included in the six-photo array then prepared and which Myers positively identified. Of the six photographs, only two were set against a background of horizontal lines, and of the two only that of defendant indicated the height measurement represented by the lines.
While the six-photograph array was preserved by the police, the 15-photograph array was not. Emma explained that this accorded with standard procedure, as he understood it, in which inconclusive arrays are not kept together intact. There was no particular explanation, however, for the loss of the two old photographs of defendant which had been included in the array.
As we understand the record, Myers never saw defendant again until trial, some two-and-a-half years after the robbery. He nevertheless then made a positive in-court identification although defendant had apparently gained considerable weight, 40 to 50 pounds, in the interim.
Myers' identification testimony was virtually the only evidence against defendant. Indeed, the only other evidence was Myers' identification, as similar to those he saw on the night of *39 the robbery, of the two stocking masks and the weapon found in the car when defendant was arrested in New York.
Defendant did not testify. He relied, for his alibi defense, on the testimony of his mother and a family friend who asserted that he had been at home in Newburgh, New York, until 11:00 p.m. on the night of the robbery, participating in a family birthday party.
Predictably, defendant's appeal from the judgment of conviction challenges the eyewitness identification. He argues that Myers' in-court identification was tainted by the suggestiveness of the out-of-court identifications and that, in any event, the indictment should have been dismissed by reason of the State's failure to have preserved all the photographic arrays intact. We reject these contentions. It is clear that all photographic arrays are required to be preserved intact. See State v. Earle, 60 N.J. 550 (1972). We cannot, however, conclude that that failure alone constitutes grounds for reversal here. See Earle at 552. No bad faith on the part of the State was shown. Moreover, we agree with the trial judge's conclusions, substantially for the reasons stated by him, that in the circumstances here the loss of the missing 15-photograph array from which a tentative identification was made was neither so material nor so prejudicial to defendant as to warrant dismissal of the indictment. See generally State v. Peterkin, 226 N.J. Super. 25 (App.Div. 1988).[1]And see State v. Colasurdo, 214 N.J. Super. 185 (App.Div. 1986); State v. Casele, 198 N.J. Super. 462 (App.Div. 1985); State v. Serret, 198 N.J. Super. 21 (App. Div. 1984), certif. den. 101 N.J. 217 (1985). See also Arizona v. *40 Youngblood, 488 U.S. ___, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). We are also satisfied that there was a sufficient evidential basis for the trial judge's conclusion that the out-of-court identification was not unduly suggestive and, in any event, that the in-court identification was in no way tainted thereby. See Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977). We do not regard the multiple photographs of defendant, whether two or three, included in the 15-photograph array as unduly suggestive since the photographs were not the same and Myers himself was not aware that he was tentatively identifying the same person in picking more than one. Compare State v. Madison, 109 N.J. 223 (1988), in which the defect in the photographic array was the multiple portrayal of what was clearly only one photographic subject. Moreover, the integrity of the subsequent identifications, both in and out of court, was preserved by Myers not being told that he had tentatively identified the subject. Nor can we say that the court erred in its conclusion that the height lines in the six-photograph array were not so suggestive as to have had the capacity to taint that identification or the in-court identification made so long after and when defendant's appearance was so changed.
We are, however, much concerned about defendant's final challenge to the identification, namely, the trial judge's exclusion of expert testimony respecting the factors which affect the reliability of eyewitness perceptions. Our consideration of this issue is significantly hampered by the fact that no preliminary hearing was held to determine admissibility. We do not know then, except in the most general terms of counsel's proffer, what the testimony would have been, on what scientific methodology it would have been based, or on what factors its reliability would have been predicated. The proposed expert was Robert Buckhout, the holder of a Ph.D. degree in psychology, a professor of psychology at Brooklyn College, Director of the Center for Responsive Psychology and Editor of Social Action and the Law. As we understand the proffer, Dr. Buckhout was *41 not offered to express an opinion as to the specific reliability of Myers' identification but rather to testify in general terms, based on the studies and experiments conducted by himself and others in the areas of perception and memory, about circumstantial factors which affect the perception and memory of victims of crime and impinge upon the accuracy of their identifications of their assailants. Again, in general terms, we understand that Dr. Buckhout was prepared to opine that cross-racial identifications are generally less reliable than identification of someone of the same race and that whites are more unlikely to be able to distinguish among blacks than vice-versa. He was also prepared to testify about a "weapon focus," i.e., the theory that when threatened with a deadly weapon, the victim's perceptions are so concentrated on the weapon as to detract from his attention upon and perception and memory of the person wielding the weapon. He also apparently holds the view that stress impairs rather than enhances perception and memory; that memory is affected by a "forgetting curve," i.e., that memory does not diminish at a uniform rate; that one's confidence in his perception is no indication of its accuracy; and that memory is affected by unconscious transfer and other associational factors. We also understand from the proffer that Dr. Buckhout was prepared to testify that at least some of these factors are not commonly understood and that at least some of them affect memory and perception in a manner contrary to common understanding. As we understand the reason for the exclusion of the testimony, the trial judge was of the view that since the subject of the expert testimony was essentially a matter of common knowledge, it would not have been helpful to the jury and might have been misleading. The judge therefore concluded that there was no need to determine, by preliminary hearing, the issue of scientific reliability.
The criteria for the admissibility of expert testimony pursuant to Evid.R. 56(2), amended in 1982 to conform with Fed.Evid.Rule 702, are well settled. As made clear by State v. Kelly, 97 N.J. 178, 208 (1984), the three basic requirements for *42 admissibility are, first, that the testimony must address a subject matter beyond the common knowledge of the average jury; second, that the "field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable"; and third, that the witness has sufficient expertise in that field to offer a reliable opinion. When the proffered scientific evidence is based on new areas of research and study, it is the criterion of reliability which typically defines the admissibility problem, and we continue, in this jurisdiction, to adhere to the classic test of reliability in this context, namely, a showing that the scientific predicates upon which the evidence is based are generally accepted within the professional community as producing uniform and reliable results. We recognize, moreover, that the required demonstration can be based on the testimony of experts, on authoritative scientific literature, and on judicial opinion accepting the reliability premise. State v. Kelly, op. cit, supra; Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 379 (1987); State v. Cavallo, 88 N.J. 508, 521 (1982).
If the expert testimony deals with scientific devices or objective testing techniques, the reliability inquiry is relatively direct and straightforward. See, e.g., Windmere, Inc., supra (voiceprints are not sufficiently reliable); Romano v. Kimmelman, 96 N.J. 66 (1984) (breathalyzer tests are sufficiently reliable); State v. Finkle, 128 N.J. Super. 199 (App.Div. 1974), aff'd o.b. 66 N.J. 139 (1974), cert. den. 423 U.S. 836, 96 S.Ct. 61, 46 L.Ed.2d 54 (1975) (VASCAR speed measurements are sufficiently reliable). The determination poses a much more difficult problem when the purpose of the proffered expert testimony is not to establish an objective fact of independent significance but rather to assist the fact-finder in evaluating witness credibility. At first blush, expert evidence so directed would appear to be proscribed not only by the reliability standard but also by the "specialized knowledge" requirement. After all, the appraisal of witness credibility is the quintessential jury function, and our entire adversarial system is predicated on our confidently held *43 belief that jurors, based on their common knowledge and experience, are competent to make that appraisal. See, e.g., State v. R.W., 104 N.J. 14, 30-31 (1986). And cf. State v. Cavallo, supra. But there are special witness credibility problems in which it is not a particular witness' testimonial sincerity or candor which is in issue but rather the assertion that as a matter of reliable scientific demonstrability, there are identifiable and recurrent circumstantial factors which influence witness perception and memory, making them potentially fallible despite the honesty of the witness' belief in their accuracy.
That was the category of expert testimony considered by the Court in State v. Kelly, supra, in which the contested scientific evidence was the psychological phenomenon of the battered women's syndrome and the purpose of the proffer was to demonstrate that a victim of that syndrome, by reason thereof and under its compulsions, might act in a manner which would otherwise appear to be irrational and hence "incredible." In prescribing the standards for admissibility of this psychological evidence, Chief Justice Wilentz made these pertinent observations:
The difficulty with the expert's testimony is that it sounds as if an expert is giving knowledge to a jury about something the jury knows as well as anyone else, namely, the reasonableness of a person's fear of imminent serious danger. That is not at all, however, what this testimony is directly aimed at. It is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths rather than common knowledge. After hearing the expert, instead of saying Gladys Kelly could not have been beaten up so badly for if she had, she certainly would have left, the jury could conclude that her failure to leave was very much part and parcel of her life as a battered wife. The jury could conclude that instead of casting doubt on the accuracy of her testimony about the severity and frequency of prior beatings, her failure to leave actually reinforced her credibility. [97 N.J. at 206 (emphasis in original)]
Thus, as he concluded,
a battering relationship embodies psychological and societal features that are not well understood by lay observers. Indeed, these features are subject to a large group of myths and stereotypes. It is clear that this subject is beyond *44 the ken of the average juror and thus is suitable for explanation through expert testimony. [Id. at 209]
The admissibility issues here raised are not conceptually different from those considered in Kelly. As in Kelly, the proffered expert testimony does not address the question of whether a particular witness is giving truthful testimony but rather purports, on the basis of what is asserted to be accepted scientific principle, to offer the jury a relevant and reliable context in which more realistically and fairly to appraise and consider the witness' perceptual accuracy.
Because there was no preliminary hearing here, we cannot say with any assurance whether the proffered testimony would have actually assisted the jury in the sense of addressing matters beyond its common knowledge and understanding. Nor can we begin to consider the reliability issue even if it were to be determined that the proffered evidence met the threshold test of helpfulness. On the other hand, based on the absence of a record and considering the judicial literature favoring admissibility, we cannot foreclose the possibility that the requisite criteria for admissibility would be met were a proper opportunity to establish them afforded.
As we have noted, there has been a proliferating consideration of this evidential issue during the last half-decade. In 1983 the Arizona Supreme Court in State v. Chapple, 135 Ariz. 281, 660 P.2d 1208 (1983), refused to follow the holding of the then leading case, United States v. Amaral, 488 F.2d 1148 (9th Cir.1973), which had excluded expert evidence of the factors affecting the reliability of eyewitness identification. The analysis of the Arizona Court proceeded from the virtual truism, recognized by the United States Supreme Court in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), that there is inordinate inherent danger in eyewitness identification testimony. As Justice Brennan there explained,
The vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: "What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. *45 The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent  not due to the brutalities of ancient criminal procedure." [388 U.S. at 228, 87 S.Ct. at 1933]
The Arizona Court was of the further view that the proffered expert testimony "would have informed the jury that there are many specific variables which affect the accuracy of identification and which apply to the facts of this case." 660 P.2d at 1220. And, the court concluded, "[w]e cannot assume that the average juror would be aware of the variables concerning identification and memory" about which the expert proposed to testify. Id. at 1221. The Court also based its admissibility conclusion on defendant's need for the evidence, the eyewitness identification there being critical to the State's case, and on the further consideration that
[t]he testimony offered was carefully limited to an exposition of the factors affecting reliability, with experimental data supporting the witness' testimony and no attempt was made to have the witness render opinions on the actual credibility or accuracy of the identification witnesses. Issues of ultimate fact may be the subject of expert testimony, but witnesses are not "permitted as experts on how juries should decide cases." [Id. at 1222]
In the following year California in People v. McDonald, 37 Cal.3d 351, 208 Cal. Rptr. 236, 690 P.2d 709 (1984), followed the lead of the Arizona courts,[2] and one year later, the Third Circuit *46 Court of Appeals in its landmark opinion in United States v. Downing, 753 F.2d 1224 (3d Cir.1985), became the first federal court to acknowledge the admissibility of such expert testimony.[3] In the four years since Downing, several jurisdictions have either held that such testimony was admissible based on the showing made in the trial court or that the proponent was entitled to the opportunity to make such a showing. See State v. Moon, 45 Wash. App. 692, 726 P.2d 1263 (1986); State v. Taylor, 50 Wash. App. 481, 749 P.2d 181 (1988);[4]State v. Buell, 22 Ohio St.3d 124, 489 N.E.2d 795 (1986), cert. den. 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165, reh. den. 479 U.S. 1000, *47 107 S.Ct. 609, 93 L.Ed.2d 607 (1986); Skamarocius v. State, 731 P.2d 63 (Alaska Ct. App. 1987); People v. Schor, 135 Misc.2d 636, 516 N.Y.S.2d 436 (Dist.Ct. 1987); People v. Lewes, 137 Misc.2d 84, 520 N.Y.S.2d 125 (Cty.Ct. 1987); People v. Brooks, 128 Misc.2d 608, 490 N.Y.S.2d 692 (Cty.Ct. 1985); U.S. v. Sebetich, 776 F.2d 412 (3d Cir.1985), cert. den. 484 U.S. ___, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988). But see contra Bloodsworth v. State, 307 Md. 164, 512 A.2d 1056 (1986); People v. Beaver, 725 P.2d 96 (Colo.Ct.App. 1986); State v. Wheaton, 240 Kan. 345, 729 P.2d 1183 (1986). We also point out that despite an acknowledgment of theoretical admissibility, the decision of a number of federal district courts to exclude the evidence following a hearing has also been sustained. See U.S. v. Blade, 811 F.2d 461 (8th Cir.1987), cert. den. 484 U.S. ___, 108 S.Ct. 124, 98 L.Ed.2d 82 (1987); U.S. v. Moore, 786 F.2d 1308 (5th Cir.1986); U.S. v. Langford, 802 F.2d 1176 (9th Cir.1986), cert. den. 483 U.S. 1008, 107 S.Ct. 3235, 97 L.Ed.2d 740 (1987); U.S. v. Poole, 794 F.2d 462 (9th Cir.1986); U.S. v. Christophe, 833 F.2d 1296 (9th Cir.1987).
In the complete absence of a record here, we are regrettably constrained in addressing the admissibility question. The issue of admissibility is, of course, one which lies in the first instance within the discretion of the trial court. In exercising that discretion, the trial judge must consider, based on the showing to be made by way of a Rule 8 hearing, the whole panoply of questions typically governing the determination. Will the testimony assist the jury in evaluating evidence without unduly misleading or overwhelming it or impinging upon its exclusive fact-finding province? Does the testimony deal with matters outside the jury's ken or with assertions contrary to common assumptions? Is it based on reliable predicates and methodology which yield uniform and reliable results? Is any potential prejudice to the State outweighed by defendant's need to challenge what is the sole or at least primary evidence against him? Does the import of the proffered testimony closely relate to the facts surrounding the eyewitness identification? *48 Does the proffered witness have the requisite expertise? Does the availability of the evidence transcend a single source? All of these questions are yet to be resolved, and we remand to the trial court for their determination by way of a Rule 8 hearing.
Defendant raises several other objections to the conviction. He contends for the first time on appeal that the convictions of aggravated assault and possession of a firearm for an unlawful purpose should have been merged into the armed robbery conviction. He also contends that the State failed to establish a sufficient chain of custody to admit the evidence of the gun and mask found in New York and that the sentence was excessive. We have considered each of these issues in the light of the applicable law and the argument of counsel thereon, and we are satisfied that they are all without merit. See R. 2:11-3(e)(2).
We remand to the trial court for a Rule 8 hearing on the admissibility of the proffered expert testimony. In the event the court rules it inadmissible, it shall enter an order confirming the judgment of conviction. In the event it rules it admissible, it shall enter an order setting the conviction aside and directing a new trial. The State may, however, appeal from such order without seeking further leave from this court.
NOTES
[1] Should defendant be retried, we agree with Peterkin's holding that defendant would be entitled to an appropriate jury instruction respecting the State's failure to have preserved the array. Defendant here contends that the denial by the trial judge of his request to give such an instruction was error. While we agree, we are satisfied that the failure did not constitute error of sufficient magnitude to warrant reversal. See State v. Macon, 57 N.J. 325 (1971).
[2] The California Court noted that:

[W]ith his characteristic vigor, Chief Judge Bazelon has called on the courts to face up to the reliability problems of eyewitness identification, to inform themselves of the results of scientific studies of those problems, and to allow juries access to that information in aid of their factfinding tasks. (United States v. Brown (D.C. Cir.1971) 461 F.2d 134, 145-146, fn. 1 (conc. & dis. opn.).) [690 P.2d at 717]
The court then pointed out that
[i]n the dozen years since Judge Bazelon's appeal, empirical studies of the psychological factors affecting eyewitness identification have proliferated, and reports of their results have appeared at an ever-accelerating pace in the professional literature of the behavioral and social sciences. No less than five treaties on the topic have recently been published, citing and discussing literally scores of studies on the pitfalls of such identification. (Eyewitness Testimony: Psychological Perspectives (Wells & Loftus edits. 1984) ...; Evaluating Witness Evidence: Recent Psychological Research and New Perspectives (Lloyd-Bostock & Clifford edits. 1983); Sobel, Eyewitness Identification: Legal and Practical Problems (2d ed. 1983); Loftus, Eyewitness Testimony (1979); Yarmey, The Psychology of Eyewitness Testimony (1979); see also Johnson, Cross-Racial Identification Errors in Criminal Cases (1984) 69 Cornell L.Rev. 934 ...; Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification (1977) 29 Stanford L.Rev. 969....) Indeed, in 1984 two leading researchers estimated that on this topic "over 85% of the entire published literature has surfaced since 1978." (Wells & Loftus, Eyewitness Research: Then and Now, in Eyewitness Testimony: Psychological Perspectives; p. 3.) The consistency of the results of these studies is impressive, and the courts can no longer remain oblivious to their implications for the administration of justice. [Id. at 718]
[3] The Third Circuit in Downing remanded to the district court for a hearing to determine reliability, relevance, whether the evidence would assist the jury, and whether the prosecutor would be unduly prejudiced. The trial court was directed to grant a new trial if it deemed the evidence admissible. On remand and following preliminary hearings, the trial court excluded the evidence, concluding that the raw data underlying the expert's studies and his methodology had not been presented and hence that reliability had not been proved, that the studies did not in any case match the facts, and that there was an undue risk the jury would be misled. United States v. Downing, 609 F. Supp. 784 (E.D.Pa. 1985), aff'd 780 F.2d 1017 (3d Cir.1985).
[4] The Washington courts permit the expert testimony only in those cases in which the identification of the defendant is the principal issue at trial, the defendant presents an alibi witness, and there is little or no other evidence linking defendant to the crime. 749 P.2d at 184. We note that each of these conditions was met here.