264 N.J. Super. 261 (1993)
624 A.2d 605
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EMILIO RODRIQUEZ, DEFENDANT-APPELLANT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ADAM CHRISTOPHER MAYO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 29, 1993.
Decided April 29, 1993.
*263 Before Judges PETRELLA, LONG and D'ANNUNZIO.
Zulima V. Farber, Public Defender, attorney for appellants (Katherine Lusby, Designated Counsel, of counsel and on the brief on behalf of Emilio Rodriquez in A-3179-90T4; Raymond J. Burke, Designated Counsel, of counsel and on the brief on behalf of Adam Christopher Mayo in A-3779-90T4).
*264 Robert J. Del Tufo, Attorney General, attorney for respondents (Steven V. McGettigan, Deputy Attorney General, of counsel and on the briefs).
PER CURIAM.
Defendants Emilio Rodriquez and Adam Christopher Mayo were indicted, along with Al Politi, on charges relating to the kidnapping of one Anthony DePasque, Sr., who had been the father-in-law of codefendant Al Politi. A jury convicted Rodriquez and Politi of first degree kidnapping; assault; aggravated assault with a weapon; terroristic threats; possession of a weapon for an unlawful purpose; and conspiracy to commit kidnapping. Mayo was convicted of conspiracy to kidnap.
The judge denied defendants' motions for a new trial. He then merged the convictions of Rodriquez and Politi for conspiracy to commit kidnapping into their respective convictions for first degree kidnapping.[1] Rodriquez was sentenced on January 4, 1991, to thirty years in prison, ten years without parole eligibility on the conviction for first degree kidnapping. In addition, the judge imposed concurrent sentences of six months for the conviction for simple assault; eighteen months without parole eligibility for the conviction of aggravated assault with a weapon; four years for terroristic threats; and seven years, three years without parole eligibility, for the conviction of possession of a weapon for an unlawful purpose.
The judge sentenced Mayo "to a term appropriate to a crime of one degree lower" (N.J.S.A. 2C:44-1f(2)) on his conviction for second degree conspiracy to kidnap, and imposed a four-year term in prison, with credit for 282 days spent in custody. On March 22, *265 1991, the judge granted Mayo's motion for reconsideration of sentence and resentenced him to five years of probation and released him from confinement.[2] Fines and Violent Crimes Compensation Board penalties were assessed.
Defendants Rodriquez and Mayo have appealed and we now consolidate those appeals for purposes of this opinion.
Rodriquez raises the following issues on his appeal:
I. The trial court erred in denying defendant's motion for a Wade[3] hearing.
II. R. 3:13-2 violates defendant's right to confrontation and cross-examination on its face as applied in this case and is contrary to the intended purpose of the rule.
A. New Jersey Court Rule 3:13-2 is overbroad infringing on defendant's right to confront and cross-examine witnesses and to a fair trial as protected by the Sixth Amendment and article I, paragraph 10 of New Jersey's constitution.
B. The court rule as applied violates defendant's rights to confrontation as protected by the state and federal constitutions.
C. The court rule was incorrectly applied so as to violate defendant's rights to confrontation and as protected by the state and federal constitutions.
III. The court erred when it admitted evidence for which the State could not establish chain of custody and logical relevance.
IV. The trial court improperly denied defendant's motion for a mistrial after the prosecutor's inflammatory comment.
V. The trial court erred when it refused to exclude defendant's record of prior convictions pursuant to Sands.[[4]]
VI. The trial court erred when it denied defendant's motion for a new trial because the verdict was against the weight of the evidence.
Mayo raises the following issues on his appeal:
I. It was error for the trial court to admit the impermissively suggestive out of court and tainted in court identifications of defendant-appellant without the necessary pretrial Wade hearing.
II. It was error for the trial court to deny defendant-appellant Mayo's and codefendant Rodriquez's joint motion for mistrial after exposure of police photographic arrays to the jury without proper authentication.
III. It was prejudicial error for the trial court to admit as evidence the fact that the police obtained a search warrant of defendant-appellant's apartment.

*266 IV. It was error for the trial court to deny defendant-appellant's motion for mistrial after the State had elicited highly prejudicial testimony from Detective Ogden regarding past alleged threats from codefendant to victim.
V. It was error for the trial court to deny defendant-appellant's request for a continuance of the trial to complete the uninterrupted cross-examination of the alleged victim.
VI. It was error for the trial court to allow the continuation of defendant-appellant's cross-examination of the alleged victim to be videotaped outside the courtroom and the resulting taped testimony presented to the jury.
VII. It was prejudicial error by the trial court to allow the hearsay declarations of the alleged victim to be presented by police testimony.
VIII. It was error for the trial court to deny defendant-appellant's motion for acquittal at the close of the State's case.
IX. It was prejudicial error for the trial court to deny defendant-appellant's motions for mistrial based upon the State's improper cross-examination of him.
X. It was error for the trial court to deny defendant-appellant's motion for mistrial on the ground of prosecutorial misconduct during the State's summation.
XI. It was error for the trial court to deny defendant-appellant's post-trial motion for new trial.
We need not recite all of the events which gave rise to the indictments and convictions in these consolidated appeals. A brief summary will suffice. On January 16, 1990 at about 2:00 p.m. Anthony DePasque, then sixty-two years old, left his Clifton home to visit an auto parts store owned by his wife and managed by his current son-in-law. He stayed there until about 6:00 p.m. that day when he and his son-in-law left in different vehicles.
DePasque arrived home at about 6:25 p.m. and parked his vehicle in his driveway. He gathered his things, including his nitroglycerine pills, and started towards the house. A car with lights off pulled up at the end of the driveway and two men got out of the vehicle shouting obscenities. They tried to force DePasque into their vehicle, but he fought with them. Someone came up behind him, grabbed him around the neck, spun him around and hit him on the head causing him to fall. He was then thrown into the vehicle where he was kicked and punched. DePasque was bleeding from the head while lying on the floor by the rear seat. At the time he did not recognize the two individuals. He then recognized the voice of a third individual as that of Al Politi, his ex-son-in-law, who was seated in the front passenger seat, telling the others to "shoot him, shoot him, kill him right *267 here." At trial DePasque identified Rodriquez as one of the two men who initially approached him in the driveway. The other man was never identified. On cross-examination, DePasque also said he recognized Politi outside the car and was arguing with him over $150,000 which Politi felt he was owed.
When the perpetrators arrived at their destination with DePasque at about 6:45 p.m. the driver blew the horn and an individual, identified at trial as Mayo, came downstairs from a second floor apartment. Rodriquez and Politi picked up DePasque from the floor of the car and brought him upstairs where Politi demanded $150,000. Rodriquez also demanded money and told DePasque that he was a Columbian and would wipe out DePasque's family. DePasque was allowed to make several telephone calls, some from a phone booth and some from Mayo's apartment. We need not relate everything that occurred in the intervening hours. Ultimately, the calls were traced and the police went to the apartment in the early morning hours of January 17, 1990. The police telephoned the apartment and told Mayo, who answered the phone call, to leave the apartment and come downstairs. Mayo complied, was apprehended, and was asked how many people were upstairs. At that point, Politi came out of the apartment followed by Rodriquez. DePasque then tried to leave the apartment and held the rail of the steps while he slid down the stairs. The police saw that DePasque was covered with blood and asked what happened. He replied that he fell down the steps and his friends were going to bring him to the hospital. He later said he told this story because he did not know what was happening and did not want anybody to get hurt. He then passed out and was taken to the hospital. DePasque had sustained a laceration on the top of the head which required stitches. He also had a broken nose, two fractured fingers, and black and blue marks on his arms and shoulders.
We have considered all of the arguments raised in light of the record and the briefs and conclude that they are without merit. R. 2:11-3(e)(2). We add only the following comments.
*268 Rodriquez and Mayo both argue that they were entitled to a Wade hearing before DePasque should have been permitted to identify them in court. Before trial, personnel from the Morris County Prosecutor's Office showed photographic arrays to DePasque on January 25 and February 1 or 2, 1990. Photographs of Rodriquez were included. A detective testified that the first photo grouping was an attempt to establish the identity of the fourth person who allegedly participated in the abduction of DePasque. This was unsuccessful on the first occasion. However, on February 1 or 2, a six-photo array was presented and one of the photos depicted Mayo. DePasque was unable to identify Mayo positively, but narrowed his choice to two photographs which he thought might have been Mayo, one of which actually was Mayo. The detective did not recall the order the photographs were given to DePasque, only that they were placed before him. Another six-photo array was presented which contained a picture of Rodriquez. DePasque was able to pick out Rodriquez's photograph. These arrays were preserved for trial.
Surprisingly, there were three days of discussion about whether there should be a Wade hearing. Defendants Rodriquez and Mayo asked the trial judge for a Wade hearing prior to trial to determine if the photo array procedure was suggestive and might taint an in-court identification. The prosecutor responded to the judge's question of why a photographic lineup was even shown to DePasque by stating that it was not used to identify who the kidnappers were, but which person played what role in the incident.
Rodriquez's attorney argued that a difference in background coloration on his client's photograph made the array suggestive as the photo of his client stood out. The judge rejected that suggestion based on his review of the photographs and the shading. He found no background more suggestive than any other. Ultimately, the judge concluded that there was an inadequate proffer of suggestiveness and that the mere fact that DePasque may have had difficulty in picking out Mayo's photograph did not require a Wade hearing. The prosecutor proffered a detective to testify as *269 to the procedures employed in exhibiting the photos, and the judge did hear his testimony. Ultimately, the judge ruled that a Wade hearing was not required.
The procedures for determining whether a Wade hearing is required were outlined in State v. Ortiz, 203 N.J. Super. 518, 497 A.2d 552 (App.Div.), certif. denied, 102 N.J. 335, 508 A.2d 212 (1985). See State v. Madison, 109 N.J. 223, 232, 536 A.2d 254 (1988); State v. Cooper, 165 N.J. Super. 57, 65-66, 397 A.2d 702 (App.Div.), appeal dismissed, 87 N.J. 304, 434 A.2d 61 (1979). There must first be a proffer of some evidence of impermissible suggestiveness before a defendant is entitled to a Wade hearing. State v. Ortiz, supra, 203 N.J. Super. at 522, 497 A.2d 552.
Our cases have also held that even where photographs differ from others in the array, that does not render them impermissibly suggestive. See State v. Farrow, 61 N.J. 434, 452, 294 A.2d 873 (1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973); State v. Mustachio, 57 N.J. 265, 274, 271 A.2d 582 (1970) (photos with defendant with front and side views on separate prints were not impermissibly suggestive). The facts in this case are similar to those in State v. Gunter, 231 N.J. Super. 34, 554 A.2d 1356 (App.Div.), certif. denied, 117 N.J. 80, 563 A.2d 841 and 117 N.J. 81, 563 A.2d 841 (1989), where the trial judge's determination that a photographic array was not unduly suggestive was upheld on appeal. We conclude there was no mistaken exercise of discretion by the trial judge in denying a Wade hearing here.
Moreover, the procedures used here did not violate the precepts of State v. Earle, 60 N.J. 550, 552, 292 A.2d 2 (1972). Indeed, defense counsel's query about the procedures used and whether they were suggestive only occurred because the judge permitted the testimony of a detective prior to his final ruling that a Wade hearing was not required. Thus, defense counsel did have the opportunity to learn about the procedures used and whether they were suggestive. Any error in the judge's ruling would thus have been harmless. The procedures used did not violate Earle. In questioning DePasque, the investigator did not indicate that *270 any particular defendant was definitely in the lineup, he was only asking DePasque if any of the four people involved were in the array. In response to the court's questioning, the detective responded that DePasque had not been told the suspects were included in the array.
As to defendants' arguments about failure to preserve a record of the out-of-court identification and that no "chain of custody" of these photographs was established, we conclude that State v. Gunter, supra, 231 N.J. Super. at 39, 554 A.2d 1356, is persuasive and controlling. There, as here, there was no bad faith shown by the police, nor was there any prejudice to defendant. The detective's testimony that to the best of his recollections these photographs were the ones used in the array was sufficient to undergird the judge's finding.
Finally, there were independent grounds for the identification. A Wade hearing was not required. See State v. Oates, 246 N.J. Super. 261, 269-270, 587 A.2d 298 (App.Div. 1991) (adequate independent grounds for identification of defendants without the photographic array). See Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972); State v. Thompson, 59 N.J. 396, 414-415, 283 A.2d 513 (1971); State v. Zarinsky, 143 N.J. Super. 35, 58, 362 A.2d 611 (App.Div. 1976), aff'd, 75 N.J. 101, 380 A.2d 685 (1977). The record adequately supports the judge's determination with respect to the lack of necessity of a Wade hearing.
Defendants' challenges to the videotaping and to R. 3:13-2 as violating their right of confrontation and cross-examination as applied in this case arise because of what transpired after direct examination of DePasque and initial cross-examination on October 1, 1990. Court adjourned until the next day. On October 2 the prosecutor applied to revoke defendant Politi's bail on the ground that after court the day before, about 4:30 p.m., the prosecutor's office received a call from DePasque's daughter to the effect that two unidentified individuals had stopped by DePasque's house and threatened him with bodily harm if he did not change his story *271 and say he only fell down some steps and in fact was not kidnapped.
The prosecutor related that DePasque was frightened by the experience and around 9:00 p.m. that night had suffered a mild heart attack. He was admitted to the hospital. The prosecutor argued that it was likely that the two individuals were connected to Politi, who was then out on bail, and Politi's continued freedom jeopardized the trial.
After a bail revocation hearing the judge revoked temporarily Politi's bail until the next day so that more information could be obtained. DePasque was still in the hospital the next day. Politi's bail status was then reinstated.
Defense counsel wanted a delay of the trial until DePasque was available, even though that might be the next week, before the State could continue with other witnesses. The judge found no prejudice to the defendants in delaying completion of DePasque's cross-examination and allowing continuation of the trial with the State's other witnesses. After the State presented its witnesses, the judge heard arguments on whether to permit videotaped testimony of DePasque in the event he remained hospitalized on Tuesday of the following week. Defendants opposed this procedure as an impairment of their right to cross-examination.
The judge ruled that a videotaped cross-examination would be allowed if it became necessary and stated his reasons as follows:
Anything that's decided today, gentlemen, of course, is subject to the medical reports that we receive from the doctor on Tuesday in the event that Mr. DePasque is not yet out of the hospital.
I've taken the unusual procedure of having this matter heard today in anticipation perhaps hopefully we will not have to utilize the procedure, but in anticipation that perhaps Mr. DePasque, for medical reasons, is not going to be able to complete his testimony here in the courtroom next week. This sort of gives you an opportunity, if you wish to take an interlocutory appeal, if you disagree with what the ruling is.
Insofar as the delay in trying this matter, I must note for the record two of the defendants, Mr. Mayo and Mr. Rodriquez, have been in the County jail since January 1990. We are rapidly approaching the one year anniversary of their being placed in a County jail, waiting for this matter to proceed.

*272 If a mistrial is declared, it is almost a certainty that the retrial will not take place until after the first of the year.
As far as the right to confront the witnesses, that is a right that is, belongs to the defendants. And the defendants' right to confrontation of the witnesses will be protected and it will be preserved.
It may be cumbersome logistically. However, I don't see any reason why, if we have to take Mr. DePasque's videotape testimony, that the defendants cannot be present along with counsel.
The right to confrontation is that of the defendants. There's no right of confrontation as such as far as the jury is concerned. All that the jury has to do is be able to observe hopefully the demeanor of the witnesses. They can make that observation on videotape.
As counsel points out, it may not be within the whole courtroom atmosphere environment. However, if the videotape has to be utilized, it will be played to the jury in the courtroom. And I don't see where it's going to detract in any way from the seriousness or solemnness of the proceedings.
I see no requirement that all of the proceedings be videotaped as counsel points out. The rule does talk, Rule 3:13-2 talks in terms of examination, cross-examination and determination of admissibility of evidence shall proceed in the same manner as at trial.
I don't see where that says, quite frankly, that stands for the proposition that either all of it is on videotape or none of it is on videotape. I do not see where that rule requires that.
As far as Mr. DePasque is concerned, we were all present in Chambers, counsel and the Court were in Chambers yesterday when we spoke to the doctor via speaker phone. He seemed to indicate that once Mr. DePasque is moved off of the ICU floor, that there would be no threat to his health. There's no reason why he could not undergo a videotaped proceeding.
I should note also that if Mr. DePasque is not released from the hospital next week, the delay does not guaranty that Mr. DePasque two weeks from now, four weeks from now or ten weeks from now is going to be anymore available than he might be next week.
I agree with counsel in the statement that really there's no precedent for a situation such as this. As a trial judge, and as trial attorneys, we always look to precedent. We look to be guided by what has taken place before.
Quite frankly, I wish it was clear-cut that there was precedent so that we would not be here today having to debate what can and cannot be done.
But here is no precedent that I can find for a situation such as this where a witness in the middle of a trial takes ill. And, in fact, it's almost at the completion of the State's case at this point since the other witnesses, most of the State's witnesses, have testified.
* * * * * * * *
As far as the question about what's going to happen if there's an objection made on the videotape to testimony of Mr. DePasque, that he might start to say something which is inadmissible, I don't see how that differs, in fact, from Mr. *273 DePasque being present in a courtroom and making the same, and the same problem arising; that Mr. DePasque might respond to a question with an answer that counsel deems objectionable or that there might be a question asked that counsel feels is objectionable.
On Tuesday, October 9, DePasque returned to court but said he was not physically able to testify. He said he had records from a CAT scan indicating he suffered another minor stroke and had just left the hospital the day before and his blood pressure was very high. The judge contacted DePasque's doctor who had "some concern about DePasque testifying at that time." DePasque was readmitted to the hospital and on October 11 his cross-examination was completed and videotaped with the judge, prosecutor, defense attorneys, defendants and court reporter present in the hospital. On October 15, this videotape was played back for the jury.
Defendant Rodriquez argues that permitting the taking of videotaped depositions of unavailable witnesses as authorized in R. 3:13-2 violated his right of confrontation under the Sixth Amendment of the United States Constitution. He also argues that the rule is overbroad. We note initially that an overbreadth argument is generally restricted to limitations on First Amendment rights. New York State Club Ass'n v. City of New York, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1, 14-15 (1988); United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697, 707 (1987); Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093, 1100 (1940); State v. Lee, 96 N.J. 156, 165, 475 A.2d 31 (1984); Petition of Soto, 236 N.J. Super. 303, 315-316, 565 A.2d 1088 (App.Div. 1989), certif. denied, 121 N.J. 608, 583 A.2d 310, cert. denied, 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 664 (1990); State v. Morales, 224 N.J. Super. 72, 79, 539 A.2d 769 (Law Div. 1987). In any event, a facial challenge was made to a Maryland statute, which permitted an alleged child sexual-abuse victim to testify by closed circuit television, before the United States Supreme Court. See Maryland v. Craig, 497 U.S. 836, 851-855, 110 S.Ct. 3157, 3166-3169, 111 L.Ed.2d 666, 682-685 (1990) (Maryland statute permitting alleged child sexual abuse victim to testify *274 by closed circuit television out of presence of defendant and jury does not violate the confrontation clause.).
Although the confrontation clause reflects a preference for face-to-face confrontation and the importance of the right of cross-examination, it does not guarantee an absolute right to a face-to-face meeting. Occasionally, this preference must "give way to considerations of public policy and the necessities of the case." Mattox v. United States, 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409, 411 (1895). See also Maryland v. Craig, supra, 497 U.S. at 849, 110 S.Ct. at 3165, 111 L.Ed.2d at 681; State v. Crandall, 120 N.J. 649, 654-656, 577 A.2d 483 (1990). The confrontation clause does not mandate eye-to-eye contact between the jury and the witness. Rather, it is to allow the defendant to confront witnesses against him. State v. Crandall, supra, 120 N.J. at 658, 577 A.2d 483. Here, a clear public policy was furthered in allowing the trial to proceed where a material witness could not testify in court, particularly in the circumstances of this case where his testimony is interrupted by illness, perhaps precipitated by threat or fear, during the course of the trial in which he had already testified in part. There was no violation of any state or federal constitutional right of the defendants, State v. Driker, 214 N.J. Super. 467, 470, 519 A.2d 942 (App.Div. 1987); State v. Washington, 202 N.J. Super. 187, 193, 494 A.2d 335 (App.Div. 1985), and hence no violation of defendants' confrontation rights in this case.
Moreover, we reject the contention that the trial judge did not consider less intrusive alternatives to permitting the videotaped testimony. The record reflects a clear showing of unavailability based on information given by the witness's physician. The trial judge was entitled to rely on that physician.
The fact that the State's other witnesses testified before defendants had an opportunity to cross-examine the victim did not prejudice defendants. The victim was not even present during their testimony. Generally all parties have some leeway as to the order in which witnesses are presented.
*275 Adjournments required by the illness of the victim and the trial judge's rulings with respect to the taking of testimony of other witnesses before the completion of cross-examination of the victim are matters entrusted to the trial judge's discretion. We find no mistaken exercise of discretion in this case. State v. Dye, 60 N.J. 518, 545, 291 A.2d 825, cert. denied, 409 U.S. 1090, 93 S.Ct. 699, 34 L.Ed.2d 675 (1972); State v. Kyles, 132 N.J. Super. 397, 402, 334 A.2d 44 (App.Div. 1975). The trial judge gave adequate reasons on the record why the trial should not be delayed when he preliminarily ruled on the question. He indicated that there was no way of telling how long the victim would be ill and he was concerned about the effect of a delay on the jury and the defendants Mayo and Rodriquez who had then been in the county jail for about ten months. The trial judge also stated:
I agree with counsel also that common sense, reasonableness and logic should dictate what the decision of the Court should be in this matter.
I do not think common sense and logic and reasonableness mean that we're to throw out all the time invested in this matter up to this point, and if Mr. DePasque is not available next week, declare a mistrial and send everybody home. And hope that two or three or four or six months from now we're going to be able to move forward with the case.
Moreover, the judge adequately instructed the jury when the videotaped evidence was presented in court. The judge told the jury: "For all intents and purposes, the proceeding that you'll see on the TV monitor is a Superior Court courtroom proceeding. All the rules apply to it." Despite the defendants' argument that the jurors did not give the videotape the same weight and attention as they would have given a witness at the trial, the judge found just the opposite to have in fact occurred. He noted that the jurors did pay attention and that there was no more wandering of the jurors' eyes than there is when there is live testimony in the courtroom.
The judgments of conviction in each case are affirmed.
NOTES
[1] Politi was sentenced to thirteen years for the kidnapping, five years without parole eligibility. He was given concurrent sentences of six months for assault; eighteen months, with eighteen months of parole ineligibility, for the aggravated assault with a weapon; four years for the terroristic threats; and seven years for the conviction of possession of a weapon for an unlawful purpose. Politi is not an appellant herein.
[2] The record does not contain the amended judgment of conviction. Also, although the cover of Mayo's brief indicates "Presently Confined," we presume that this is an error unless subsequent events resulted in re-incarceration.
[3] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
[4] State v. Sands, 76 N.J. 127, 386 A.2d 378 (1978).