821 A.2d 547 (2003)
360 N.J. Super. 101
STATE of New Jersey, Plaintiff-Respondent,
v.
Frank BENITEZ, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Angel Colon, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 2003.
Decided May 7, 2003.
*548 William J. Rohr, Assistant Deputy Public Defender, argued the cause for appellant Frank Benitez (Yvonne Smith Segars, Public Defender, attorney; Mr. Rohr, on the brief).
John Vincent Saykanic, Passaic, argued the cause for appellant Angel Colon (Yvonne Smith Segars, Public Defender, attorney; Jean B. Bennett, of counsel and on the brief).
Frank Muroski, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Bennett A. Barlyn, Deputy Attorney General, of counsel and on the brief).
Angel Colon, appellant, submitted a pro se supplemental brief.
Before Judges BRAITHWAITE, PARKER and BILDER.
The opinion of the court was delivered by BRAITHWAITE, J.A.D.
We have combined the opinions in these two appeals because defendants Frank Benitez and Angel Colon raise the same *549 issue: the trial judge erred in allowing the victim of the offense to testify by way of a videotape deposition pursuant to Rule 3:13-2. Following a trial using this procedure, both defendants were convicted of second degree robbery, N.J.S.A. 2C:15-1a(1); criminal restraint, N.J.S.A. 2C:13-2a; burglary, N.J.S.A. 2C:18-2a(1); and theft, N.J.S.A. 2C:20-3a. They both received extended term sentences. Benitez was sentenced to an aggregate term of eighteen years with a nine-year parole bar, and Colon received a twenty-year term with a ten-year period of parole ineligibility.
Our review of the record convinces us that the judge erred in permitting the victim to testify by videotape deposition. We therefore reverse defendants' convictions and remand for a new trial. Both defendants raise other issues. We also address some of those issues in this opinion.

I
We set forth the facts leading to defendants' convictions and those related to the victim's testimony by way of videotape deposition. On Tuesday, October 12, 1999, at approximately 12:00 p.m., the victim, Lillian War ("War"), then age ninety-two, arrived at her home at 1077 25th Street in Paterson with her daughter and son-in-law after taking a trip to the New Jersey Shore. Her daughter and son-in-law left shortly after placing War's plaid suitcase on her bed and her groceries and laundry on the table. At 1:00 p.m. her doorbell rang and she answered the door. War testified that she was sure of the time because she always wore a wristwatch and she looked at the time. At the door was a man she described as tall and heavyset who indicated that he had a package for her. As she opened the door, a smaller man wearing a hood over his head, whose face she did not see, suddenly grabbed her. She fainted and awoke to find herself lying in the hallway of her home. The assailant who grabbed her then picked her up, sat her in a chair facing a corner, and stood guard over her while the other assailant took her property.
The assailant described by War as the "big guy" then entered her bedroom and emptied the contents of her plaid suitcase and placed the stolen items inside the suitcase. According to War, both assailants left her home at exactly 1:30 p.m. After the assailants left, she went upstairs to get her walker and then tried unsuccessfully to activate her burglar alarm system. She then tried to use the telephone but all four telephones in her home had been disconnected by the assailants. Finally, after being unable to activate the burglar alarm or use the telephone, she used her walker to walk down her driveway and across the street to her neighbor, Lucy Cobilich, to alert her of the incident. War asked Ms. Cobilich to call the bank to prevent the assailants from potentially cashing a check. She testified that she was concerned about her checkbook because she had just deposited $19,000, which she intended to give to her grand-daughter as a deposit on a house. Ms. Cobilich called the bank and then called the police.
Once the police arrived, they met with War who stated that she was not injured. She refused medical treatment. She was unable to identify the assailants. She stated that her vision was impaired and she could only describe one of the suspects as being big and heavyset and the other as being shorter and smaller. She also told police that she did not know the two men who lived next door.
Ronald Cobilich, Ms. Cobilich's son, testified at trial. He testified that on October 12, 1999, sometime around noon or 1:00 p.m., he was mowing his lawn when he *550 noticed a blue car parked in the area with a man standing next to it. Subsequently, at approximately 1:30 p.m., his neighbor, War, came across the street and told him and his mother that War's house had just been robbed and asked that they call the police. While waiting for the police to arrive, Mr. Cobilich noticed a blue car with two occupants drive slowly on 23rd Avenue past East 25th Street and then park two houses down. Mr. Cobilich then observed an Hispanic male, whom he believed to be one of the occupants of the car, walking on the opposite side of the street on East 25th Street carrying a brown paper bag. The Hispanic male then crossed the street and entered the residence located next to War's home with a key. Approximately one minute later, Mr. Cobilich observed the same blue car traveling down the street with only the driver. The car then stopped in front of the house at 1081 East 25th Street and honked the horn. Mr. Cobilich testified that the person whom he previously observed enter the house with the brown paper bag came outside and spoke with the driver. Both individuals then walked back into the house.
Based on the information provided by Mr. Cobilich, the police examined the blue Chevrolet and noticed that the headlights had been left on. A license plate check determined that the vehicle was registered to Benitez's girlfriend, Vivian Nieves, at 1081 East 25th Street. Approximately six officers went to that address and rang the door bell. They also knocked on the windows, and the front, side, and back doors for approximately ten to fifteen minutes in an attempt to locate Nieves. After receiving no response, an officer was stationed in front of the house to prevent anyone from leaving and to watch the blue Chevrolet.
Police learned that Nieves was employed by the Passaic County Probation Department. The police contacted Nieves at work and met with her at a location near her place of employment. After explaining the situation to her, one of the officers, Sergeant Giaquinto, advised her that the police needed to gain access to her home. He also advised her that she "wasn't compelled to do this ... but we would appreciate her cooperation." He further testified that Nieves was very cooperative and stated that she was very willing to help. Nieves signed a consent to search form for her residence but indicated that she did not wish to be present. However, she gave Sergeant Giaquinto the keys to her home. The consent to search form clearly advised her of her right to refuse to consent.
After securing the consent to search and the house keys, the police returned to 1081 East 25th Street and knocked on the door. There was no answer. The police then entered the residence with the keys and announced their presence. Benitez came out of a bedroom and the police advised him that they were investigating a robbery. He was also told that he was not under arrest. Sergeant Giaquinto testified that Benitez was very cooperative, and that he asked Benitez what time he came into the house that day. Benitez responded that he "came home from work about 12:30 p.m. today," and that he had been sleeping for about an hour and a half. Benitez advised Sergeant Giaquinto that he came home alone and was alone in the house, and consented to let the police check around the premises. However, Benitez was not told that the police had secured a consent to search from Nieves.
Using a coat hanger, Sergeant Giaquinto unlocked a door off the kitchen and found a second Hispanic male, Colon, sleeping in a bed. In response to Detective Giaquinto's question about what time he came home that day, Colon replied, "It was 12:30 p.m. today." When asked whether *551 he came in alone or with Benitez, Colon replied, "With Benitez."
The police conducted a further search of the residence and located a VCR in an armoire in Benitez's bedroom. A plaid suitcase and two brown paper bags filled with numerous pieces of jewelry were also found in a drop ceiling panel in Benitez's bedroom. In addition, Sergeant Giaquinto recovered a gold chain with the name "Lillian" on the floor near the bed where Colon had been sleeping. Both defendants were then read their rights and arrested. Sergeant Giaquinto testified that as defendants were led outside, Mr. Cobilich identified them as the individuals he had seen previously.
War identified the items as the ones that were stolen from her that day. Defendants were also found in possession of numerous coins, including old coins. Several weeks later, Nieves returned a gold bracelet to War that Nieves found in her home in a pair of socks.
Prior to the trial, the State moved to have War testify by way of videotape deposition. At the hearing on February 15, 2001, the State advised the judge that War was ninety-four years old and would suffer heart palpitations if made to testify in the presence of defendants and the jury. Defendants objected on the grounds that the State had presented no medical evidence that War was physically or mentally incapacitated and that to allow her to testify outside the presence of defendants and the jury violated their right to confrontation. Based on the State's representation, the judge concluded that War could testify by videotape deposition because to allow her to testify at trial in the presence of defendants and the jury would be detrimental because of her advanced age and mental and physical health.
The judge said:
Now, I'm satisfied at this point in time, from the representation by the State, that I have a 94-year-old woman, who is in such mental and physical condition that at this point in time, to subject her to a trial in an open courtroom, before a jury and all of the machinations and all of the aura of a courtroom could prove deleterious to her health. I think it's incumbent upon a judge to take a victim's health into consideration.
Now, I am satisfied, based upon what the State has indicated, that it is likely that she would be unable to testify because of age and because of her mindset by view of what occurred, which apparently affects her and affects her ability to function and towhether it's life threatening or not, I don't think is important.... It doesn't say it has to be life-threatening.

[emphasis added.]
The judge scheduled the deposition for the next day and set forth the procedure that would be followed. He said:
Now, I'm going to make an inquiry tomorrow when she gets here, and I have an opportunity to talk to her, as to whether that can be done. I want to be satisfied personally, and I think all counsel should be satisfied personally whether that can be done.
If, in fact, that can be accomplished, it can be done right here, and then the problem you raised does not apply.
So I want you to understand that I'm not accepting at face value what the State says. I want to be satisfied based upon my discussions with the woman, in the presence of counsel, of course, whether or not it would be a risk to her health or would affect her ability to testify if she sat in this witness box, right in this room.
So that'll be the preliminary inquiry that I will make. And counsel can ask *552 whatever questions they choose, and I'll make the decision right then and there.
If my decision is that, in fact, it would not be appropriate for her to testify in the presence of these defendants, then it is my intention to do it the following way:
I will do it in chambers, with counsel present, the prosecutor present, me present, on videotape. I will have the defendants seated out here, right on the other side of my door, with the door open, and the video will be playing so that they can watch everything that takes place.
....
If that's not the way you want to do it, you'll have free and ready access to come out here and talk to your clients about anything that you want to discuss at any time.
Now I realize that that is not, shall we say, face to face, but it's a sensible, reasonable way to try to protect everybody's interest. The interest of [War], who's 94. Your interest in being able to cross-examine fully. Your clients' interest to be able to participate as fully as possible, under the circumstances, in the deposition of the witness.
I'm only going to do that if in fact I conclude, after my own examination, that she cannot, in fact, function in the presence of these defendants. If she can, it's going to be done here.
The next day, February 16, 2001, prior to the deposition, the judge interviewed War. The judge did not place War under oath. The following colloquy occurred:
JUDGE: Ms. War, how old are you?
MS. WAR: 94.
JUDGE: God bless you. I hope I get that old. Now you understand why you're here today, correct?
....
MS. WAR: Yes, because they broke into my house.
....
JUDGE: Now it has been represented to me by the Prosecutordon't know. I haven't met you before ... that you are unable to actually testify at the trial. In other words, that you could not sit out there with a jury in the jury box, in the presence of the defendants and tell your story. Is that true or not?
MS. WAR: It's true.
JUDGE: Okay, Why?
MS. WAR: A number of years ago, I had two heart attacks. And ... after that, I was able to take care of myself and I could do things. But now that I'm 94 and when hewhen I opened the door and he grabbed me, it did something to me and I'm shaking. I'm shaking and I'm very nervous now. And I don't need problems again. I don't want no problems.
JUDGE: Do you feel that if ... you had to testify in court next week at the trial with [defendants] in the room and the jury in the jury box, do you feel that it would affect your health and you would be under a tremendous amount of stress?
MS. WAR: I feel that stress won't be good for me because I'm alreadyall my insides are like this right now and I'm shaking.
JUDGE: Are you presently under a doctor's care?
MS. WAR: Well, I go to the doctor, yeah. But I take medication.
....
JUDGE: Now you're aware of the fact that [the defendants] are presently... in jail[?]
MS. WAR: Yes.
....
*553 JUDGE: [D]o you think that you would be able, based upon your personal health considerations, to be able to answer those questions with them in the room?
MS. WAR: No, I would rather not face them.
JUDGE: Could you face them? Whether you rather would ... or not, could you do it?
MS. WAR: I don't think I could do it becauseI can't do it. No.
JUDGE: Do you feeland only you know .... that if they're in the same room with you out there, that you would possibly pass out again or have some type of neurological problem?
MS. WAR: I don't ... know. No, I don't want to do this. No, I don't.

[Emphasis added.]
In concluding that War would testify by way of videotape deposition outside defendants' presence, the judge said:
I want the record to reflect that I had an opportunity to ... ask the lady certain questions and to observe her demeanor. She's 94 years old. She walks with the assistance of a walker. It's quite clear to me that she's extremely distraught about even being here. And based upon the way she responded when I suggested that she testify, even in camera with the defendants in the room, I am satisfied that she is unable to do so based upon her age, her nervous condition and her general state of frailty. I therefore am not going to have the defendants in the room at the same time. I'm going to proceed as I suggested yesterday, which in my opinion does not deny them any right of confrontation.
....
Both counsel, the Prosecutor and myself will be in my office to conduct the examination on videotape. It will be played simultaneously to both defendants in this room so they can see and hear everything that's going on. And in the event that counsel wishes to consult with the defendants, they have a right to walk out here at any time to speak with them.
....
Just so the record understands. I'm doing this to preserve the testimony of the witness.... I'm doing it because it's the only way that I can preserve the testimony of this witness. I think she's very reluctant to even be here today. She's 94 years old. God bless her. And she is definitely in some type of frail condition and she's extremely, extremely upset and nervous, and I don't think she could function in this courtroom for one minute.
The videotape deposition was conducted in the judge's chambers with War, the judge, the prosecutor, and defense counsel present. Defendants were excluded from the judge's chambers, but viewed the deposition from the courtroom by way of a monitor. Through counsel, defendants cross-examined War during the deposition.
The trial commenced on February 20, 2001, four days after the deposition. The deposition was played before the jury. Defendants were convicted as noted above, and this appeal followed.

II
Defendants argue that the trial judge erred in allowing War to give videotape testimony because she did not suffer from a "mental incapacity" within the meaning of Rule 3:13-2. Essentially, they argue that the judge erroneously relied upon the representations by the prosecutor, War's unsworn statement, and the judge's own perception that War would suffer a "mental incapacity" because of her age, emotional *554 condition, and her fear of a trial's potential effect upon her physical health. Defendants contend that War did not suffer from a "physical incapacity" because she was able to travel to the courthouse to be interviewed four days before the trial, and that, during the interview and again at the deposition, she exhibited a strong demeanor and appeared in full control of her faculties. Thus, defendants argue that the trial judge erred in failing to obtain corroborating medical evidence of War's "mental incapacity" as required by Rule 3:13-2.
The State contends that the judge made a case specific finding of necessity to justify the videotape deposition and that the procedure satisfied the requirements of the Confrontation Clause. Rule 3:13-2 is the controlling court rule with regard to the taking of a de bene esse deposition in a criminal case. The relevant portion of the rule states:
(a) .... If it appears to the judge of the court in which a complaint, indictment or accusation is pending that a material witness is likely to be unable to testify at trial because of death or physical or mental incapacity, the court, upon motion and notice to the parties, and after a showing that such action is necessary to prevent manifest injustice, may order that a deposition of the testimony of such witness be taken.
(b) .... The deposition shall be videotaped unless the court orders otherwise.... All parties and counsel shall have a right to be present at the deposition. Examination, cross-examination and determination of admissibility of evidence, shall proceed in the same manner as at trial....
(c) .... Depositions taken pursuant to this rule may be used at trial in lieu of live testimony of the witness in open court if the witness is unable to testify because of death or physical or mental incapacity.
Thus, the rule limits the taking of a material witness's deposition to those cases where he or she is likely to be unable to testify at trial because of "death or physical or mental incapacity" and a deposition is necessary to prevent a manifest injustice. Ibid. Essentially, the rule provides a means of preserving the witness's testimony for use at trial in the event the witness is unable to appear at trial to testify because of "death or physical or mental incapacity." Ibid.
The use of deposition testimony in a criminal case "`should be tightly limited to those situations where it is truly necessary.' " Pressler, Current N.J. Court Rules, comment 1 on R. 3:13-2 (2003) (Report of the Supreme Court Comm. on Criminal Practice, 118 N.J.L.J. Index Page 139 (1983)). Furthermore, the procedure employed in taking the deposition and the manner in which it is used should be careful enough so that use of the deposition in lieu of live trial testimony does not offend both the New Jersey and Federal constitutions and is fair to all parties. Ibid. (citing Report of the Supreme Court Comm. on Criminal Practice, supra, 118 N.J.L.J., Index Page 139).
"The right of an accused to be confronted by the witnesses against him is protected by the Sixth Amendment to the United States Constitution and by the Constitution of New Jersey." State v. Nutter, 258 N.J.Super., 41, 53, 609 A.2d 65 (App.Div.1992)(citing U.S. Const. Amend, VI; N.J. Const. art. I, ¶ 10). "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as `essential to a fair trial in a criminal prosecution.'" Coy v. Iowa, 487 U.S. 1012, 1017, 108 S.Ct. 2798, *555 2801, 101 L.Ed.2d 857, 864 (1988) (citations omitted). The Confrontation Clause guarantees two types of protection to a criminal defendant: (1) the right to physically confront witnesses against him; and (2) the right to cross-examine. Ibid. The Confrontation Clause is applicable to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 401, 85 S.Ct. 1065, 1066, 13 L.Ed.2d 923, 924 (1965).
In Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), the first case interpreting the Confrontation Clause, the United States Supreme Court noted:
The primary object of the [Confrontation Clause] ... was to prevent depositions or ex parte affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.
[Mattox v. U.S., supra, 156 U.S. at 242-43, 15 S.Ct. at 339, 39 L.Ed. at 411.]
Although the constitutional right to confrontation is firmly entrenched in American jurisprudence, the right is not absolute. Maryland v. Craig, 497 U.S. 836, 844, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666, 677 (1990). Both the United States Supreme Court and our Supreme Court have held that the right is subject to certain exceptions of consequence. Maryland v. Craig, supra, 497 U.S. at 857, 110 S.Ct. at 3170, 111 L.Ed.2d at 686 (using closed circuit television testimony does not violate Confrontation Clause where child witness fears defendant); Idaho v. Wright, 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 657 (1990) (admitting hearsay statements into evidence does not violate Confrontation Clause when statements have sufficient indicia of reliability); Coy v. Iowa, supra, 487 U.S. at 1021, 108 S.Ct. at 2803, 101 L.Ed.2d at 867 (holding an exception to Confrontation Clause must further important public policy); Pennsylvania v. Ritchie, 480 U.S. 39, 60, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40, 60 (1987) (determining that Confrontation Clause does not compel pre-trial discovery); Bourjaily v. United States, 483 U.S. 171, 183-84, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144, 158 (1987) (holding co-conspirator hearsay exception does not violate Confrontation Clause); United States v. Inadi, 475 U.S. 387, 400, 106 S.Ct. 1121, 1129, 89 L.Ed.2d 390, 402 (1986) (same); Ohio v. Roberts, 448 U.S. 56, 77, 100 S.Ct. 2531, 2545, 65 L.Ed.2d 597, 615 (1980) (stating demonstration of unavailability of witness is not necessary prerequisite to admission of certain hearsay to avoid violation of Confrontation Clause); California v. Green, 399 U.S. 149, 168, 90 S.Ct. 1930, 1940, 26 L.Ed.2d 489, 503 (1970) (holding prior statement subject to cross-examination when made does not violate Confrontation Clause); State v. Crandall, 120 N.J. 649, 658, 577 A.2d 483 (1990) (holding child's closed circuit television testimony in a child abuse case does not violate Confrontation Clause where child-victim-witness fears defendant).
Our courts have upheld the use of deposition testimony in criminal cases only on rare occasions where the deposition was truly necessary. In State v. Rodriquez, 264 N.J.Super. 261, 624 A.2d 605 (App.Div. 1993), aff'd o.b. 135 N.J. 3, 637 A.2d 914 (1994), the victim suffered a mild heart attack and was hospitalized shortly after his direct testimony in court and before *556 the defense had an opportunity for cross-examination. Id. at 270-71, 624 A.2d 605. The judge postponed completion of the victim's cross examination and allowed the trial to continue with the State's other witnesses. Id. at 271, 624 A.2d 605. After the State called its other witnesses, the judge heard arguments on whether the victim's testimony should be videotaped in the event he remained hospitalized. Ibid. The defendants opposed this procedure on the ground that it violated their right to cross-examine the witness. Ibid.
The victim subsequently returned to court but testified that he was physically unable to testify. Id. at 273, 624 A.2d 605. He further stated that he had the report of a CAT scan that indicated that he suffered another minor stroke "and had just left the hospital the day before and his blood pressure was very high." Ibid. The judge contacted the victim's doctor who voiced his concerns about the victim testifying at that time. The victim was subsequently readmitted to the hospital and his cross-examination was completed by videotape deposition at the hospital, with the judge, prosecutor, defense attorneys, defendants, and court reporter present. The deposition was subsequently played for the jury. Ibid.
Rodriguez appealed, contending that his right to confrontation was violated by the deposition pursuant to Rule 3:13-2. Ibid. We held that the defendant's right to confrontation was not violated because
public policy was furthered in allowing the trial to proceed where a material witness could not testify in court, particularly in the circumstances of this case where his testimony is interrupted by illness, perhaps precipitated by threat or fear, during the course of the trial in which he had already testified in part.

Id. at 274, 624 A.2d 605.
Similarly, in State v. Washington, 202 N.J.Super. 187, 494 A.2d 335 (App.Div. 1985), the victim sustained a heart attack at a prior court hearing. Id. at 191, 494 A.2d 335. As a result, the trial date was adjourned on several occasions in anticipation of his recovery. Ibid. Subsequently, the witness's physician advised the court that the witness would be unable to appear because of his illness. Ibid. In affirming the trial judge's decision, we held that the admission into evidence of the victim's deposition did not violate the confrontation clauses of either the United States or New Jersey Constitutions. Id. at 193, 494 A.2d 335. However, we stated that "before a deposition videotape is admitted in evidence the State must bear a heavy burden of demonstrating to the trial judge that the witness in question is literally unavailable." Id. at 194, 494 A.2d 335.
In a case bearing a remarkable similarity to the case here, the Sixth Circuit Court of Appeals held that a defendant's right to confrontation was violated because the witnesses were not in fact literally "unavailable" but were unavailable because they preferred not to testify and had presented a doctor's affidavit stating that they were in poor health. Stoner v. Sowders, 997 F.2d 209, 212 (6th Cir.1993). In Stoner, the defendant was charged with burglary. A Kentucky rule allowed the taking of depositions in a criminal case if it appeared "that a witness may be unavailable to testify at trial, or if the parties agree[d]." Id. at 211 n. 1. Because the victims of the burglary were elderly, the prosecutor obtained a court order which allowed the taking of their depositions. Id. at 211. The victim's physician also submitted an affidavit which stated that they were in "`extremely poor physical health'" and that their "`physical health ... could be impaired if they were subjected to the rigors of sitting through a jury trial.'" *557 Ibid. Defendant was convicted and appealed.
The Kentucky Court of Appeals held that the defendant's right to confrontation had not been violated because he had been present at the depositions and his trial counsel had the opportunity to cross examine the witnesses on the eve of trial. Id. at 212. In rejecting that conclusion, the Sixth Circuit Court of Appeals said:
The Kaelins [the victims] were not in fact "unavailable" in the literal or usual sense of the word. To say they were "unavailable" is a legal fiction. They were present and gave their deposition near the courthouse the day before the trial. They were in fact "available" to testify at the trial. They were "unavailable" only in the sense that they preferred not to testify and were in poor health according to the doctor's affidavit.
When the question is one of the health of the witness, there must be "the requisite finding of necessity" which is "case specific" in order to dispense with confrontation in open court. Maryland v. Craig, 497 U.S. 836, 855, 110 S.Ct. 3157, 3169, 111 L.Ed.2d 666 (1990).

[Ibid.]
Here, we are satisfied that the trial judge erred in allowing the videotape deposition in lieu of the live testimony of War at trial. Rule 3:13-2 only allows the use of the de bene esse deposition in those cases where the witness is unable to appear in court to testify because of "death or physical or mental incapacity." There is no basis on this record to conclude that War was unable to testify because of physical or mental incapacity.
War was certainly physically capable of appearing at trial to testify because she appeared four days prior to trial at the courthouse for the purpose of the interview and the actual videotaped deposition. Further, the record does not support that she was unavailable because of a mental incapacity. Here, the only evidence before the judge was War's advanced age and her physical disability, she used a walker. There was no medical evidence to support her inability to testify at trial because of her "physical or mental incapacity."
War told the judge that she would "rather not face" defendants and that she did not want to testify. She also was nervous and had two heart attacks "a number of years ago." Although we can understand War's reluctance to testify, given her age, her fear and anxiety following the trauma she suffered during the crime, this record is insufficient to permit her testimony by way of deposition. The State failed to demonstrate that War was "literally unavailable." State v. Washington, supra, 202 N.J.Super. at 194, 494 A.2d 335.
Here there was not only a mistaken, a priori, judgment that a 94-year-old woman was unavailable, but the reality, as shown by her taped testimony, was that she was perfectly fit to testify. Her testimony revealed that she was handicapped, used a walker, and had hand holds on the banisters which helped her get up and down to the second floor and basement of her home. However, she did not let her handicap keep her from taking care of herself. After the robbery, despite the troubling event, she went around the house checking each of the four phones for one that was working, then went outside to seek help and, totally unconfused, made known the important priority of notifying the bank. She was very alert during the deposition. For example, when, in answer to an irrelevant question which interrupted her testimony about the robbery, she said she had been living in the house since she was seventeen years old. The prosecutor calculated that she had lived there for approximately eighty years, but she corrected *558 the prosecutor to note that it was over seventy years. This was just one example. In her deposition testimony, just four days before trial, War was alert, responsive and demonstrative.
When there is a claim that a witness is unable to testify because of physical or mental incapacity so as to support the use of Rule 3:13-2, there ought to be medical proofs to establish the conditions of the rule. Stoner v. Sowders, supra, 997 F.2d, at 212-13. No such proofs were produced here. In fact, the judge based his ruling on the representations of the prosecutor and the unsworn remarks from War during the interview. Essentially, the record is clear that the judge was persuaded by War's age, to allow her to testify by deposition.
In our view, the concerns expressed by the Sixth Circuit Court of Appeals apply here:
To allow trial by deposition here (whether video or written) to substitute for regular trial testimony would over time invite trial by deposition in many, perhaps most, criminal cases. Many witnesses would prefer not to testify in a criminal trial and can often find a doctor who will provide a cursory "doctor's excuse," a statement that the witness's physical or mental health "could" be adversely affected by having to appear. A prosecutor will often prefer to offer deposition testimony because the witness need not be secured for trial and need not be subject to the vicissitudes of cross examination before the jury. The result of such a rule allowing trial by deposition violates both the literal language and the purpose of the Confrontation Clause, assuring the right of the accused: "in all criminal prosecutions ... to be confronted with the witnesses against him." The Kentucky procedure used here may be easier and more efficient in terms of judicial and prosecutorial administration, and it may offer the same reliability that we require in civil cases.
But the deposition is a weak substitute for live testimony, a substitute that the Sixth Amendment does not countenance on a routine basis. The Constitution does not allow us to so water down the explicit requirement of live testimony in criminal cases.

[Id. at 213.]
The use of deposition testimony in criminal cases is highly disfavored, mainly because such use tends to diminish a defendant's Sixth Amendment confrontation rights. United States v. McKeeve, 131 F.3d 1, 8 (1st Cir.1997). The Confrontation Clause's main concern "is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, supra, 497 U.S. at 845, 110 S.Ct. at 3163, 111 L.Ed.2d at 678. The Clause principally addresses the concern that a defendant has a right to a face-to-face confrontation of the witnesses against him and has a right to conduct cross-examination of those witnesses. See Coy, supra, 487 U.S. at 1017, 108 S.Ct. at 2798, 101 L.Ed.2d at 857; Pennsylvania v. Ritchie, supra, 480 U.S. at 51, 107 S.Ct. at 998, 94 L.Ed.2d at 53 (1987); see also, Ohio v. Roberts, supra, 448 U.S. at 63, 100 S.Ct. at 2531, 65 L.Ed.2d at 597 (discussing the Confrontation Clause's "preference for face-to-face confrontation.") Generally, then, when the prosecution seeks to introduce a deposition in a criminal trial in lieu of live testimony, a "defendant has the right to be present during the deposition so that he may confront the deponent." United States v. McKeeve, supra, 131 F.3d at 12 (citation omitted). Here, however, defendants were not literally present when *559 the videotape deposition of War was taken. They were in a different room viewing the deposition on a monitor. Rule 3:13-2 allows all parties to be present at the deposition.
We reject the State's position that N.J.S.A. 2A:84A-32.4 is support for the procedure used here. That statute authorizes the taking of the testimony of a child witness during the trial "by closed circuit television in certain cases, including those involving child abuse." State v. Crandall, supra, 120 N.J. at 653, 577 A.2d 483. The offenses here are not covered by the statute and War is not a child. N.J.S.A. 2A:84A-32.4 specifically has been held not to violate the Confrontation clause, but has no application here.
Our dissenting colleague contends that we ought to remand this matter "for a hearing to determine whether War was physically incapacitated to the extent that she was unable to testify before the jury." We perceive no basis on this record for such a remand. The State failed to establish that War was unavailable for purposes of the application of Rule 3:13-2. The proof of War's availability is in the "proverbial pudding" when War's videotape deposition, taken four days before trial at the courthouse in the judge's chambers adjacent to the courtroom, is reviewed and considered.
Moreover, we are not persuaded that now, more than two years after War's deposition testimony, a hearing to determine her unavailability at that time is capable of being conducted. There is no indication on this record of the availability or unavailability of the proofs necessary to determine War's unavailability at that time. The State at the time of its application to have War testify by way of deposition should have inquired into such proofs or the lack of such proofs. However, the present record, particularly the deposition itself, in our view, clearly demonstrates War's availability to testify at trial.
The trial judge erred in allowing War to testify by way of deposition. The procedure violated defendants' right to confrontation. Accordingly, we reverse defendants' convictions and remand for a new trial.

III
On this appeal, Colon raises the following other points:
POINT I
THE EVIDENCE SEIZED FROM THE HOUSE WAS ILLEGAL AND CO-DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SHOULD HAVE BEEN GRANTED.
POINT II
THE DEFENDANT'S CONVICTION IS AGAINST THE WEIGHT OF THE EVIDENCE AND THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL.
POINT III
THE DEFENDANT'S SENTENCE IS EXCESSIVE: THE TRIAL COURT ERRED BY IMPOSING AN EXTENDED SENTENCE WITH LENGTHY PAROLE INELIGIBILITY TERM.
In a pro se brief, Colon also contends:
POINT II
THE SEARCH AND SEIZURE VIOLATED DEFENDANT'S FOURTH AMENDMENT AND STATE CONSTITUTIONAL RIGHTS SINCE A) NIEVES' CONSENT TO SEARCH WAS NOT VOLUNTARY; AND B) THE POLICE SHOULD HAVE OBTAINED A SEPARATE CONSENT FROM BENITEZ AND COLON OR AN ARREST WARRANT FOR COLON; *560 ALL EVIDENCE SEIZED SHOULD HAVE BEEN SUPPRESSED U.S. CONST. AMEND. IV; N.J. CONST. ART. I, PAR. 7.
A. The Invalidity of Nieves' Consent.
B. The Lack of Consent from Benitez and Colon.
POINT III
THE DEFENDANT'S STATEMENT TO THE POLICE SHOULD HAVE BEEN SUPPRESSED AS HIS MIRANDA AND FIFTH AMENDMENT CONSTITUTIONAL NEW JERSEY STATE COMMON LAW PRIVILEGES AGAINST SELF-INCRIMINATION WERE VIOLATED; THE ADMISSION OF THE STATEMENT CONSTITUTES REVERSIBLE ERROR.
POINT IV
THE TRIAL JUDGE ERRED IN DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL AS TO COUNT 2 (THIRD DEGREE CRIMINAL RESTRAINT) SINCE THERE WAS NO RISK OF SERIOUS BODILY INJURY; THE STATE FAILED TO PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT CONTRARY TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES AND NEW JERSEY CONSTITUTIONS.
POINT V
THE PROSECUTOR IMPROPERLY INFRINGED UPON THE CO-DEFENDANT BENITEZ'S RIGHT TO REMAIN SILENT IN VIOLATION OF THE FIFTH AMENDMENT; THE TAINT OF THIS CONSTITUTIONAL ERROR VIOLATED DEFENDANT COLON'S DUE PROCESS RIGHT TO A FAIR TRIAL.
POINT VI
THE EXTENSIVE AMOUNT OF HEARSAY TESTIMONY ELICITED AT TRIAL VIOLATED DEFENDANT'S SIXTH AMENDMENT CONFRONTATION RIGHTS AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL.
POINT VII
THE DEFENDANT'S SIXTH AMENDMENT CONFRONTATION AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOLATED BY THE STATE WRITING THE WORDS TESTIFIED TO BY STATE'S WITNESSES ON AN EASEL FOR USE DURING SUMMATION.
POINT VIII
THE TRIAL JUDGE ERRED IN ADMITTING ALL THREE OF DEFENDANT'S PRIOR CONVICTIONS INTO EVIDENCE IN VIOLATION OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL.
POINT IX
NUMEROUS ERRORS OCCURRED AT TRIAL WHICH DEPRIVED THE DEFENDANT OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL.
POINT X
THE PROSECUTOR EXCEEDED ALL BOUNDS OF PROPRIETY IN SUMMATION AND DEPRIVED DEFENDANT OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL.
Benitez raises the following additional points on appeal:
POINT II
DEFENDANT WAS DENIED HIS RIGHTS UNDER THE FOURTH AMENDMENT TO THE: UNITED STATES CONSTITUTION AND ART. *561 I, PAR. 7, OF THE STATE CONSTITUTION BECAUSE POLICE DID NOT OBTAIN A VALID CONSENT TO SEARCH FROM VIVIAN NIEVES.
POINT III
DEFENDANT WAS DENIED HIS RIGHT OF CONFRONTATION UNDER THE STATE AND FEDERAL CONSTITUTIONS BY THE ADMISSION INTO EVIDENCE OF CO-DEFENDANT COLON'S ORAL STATEMENT.
POINT IV
THE COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL IN REGARD TO THE CHARGE OF CRIMINAL RESTRAINT BECAUSE THE STATE FAILED TO PROVE THAT THE PERPETRATORS KNOWINGLY EXPOSED LILLIAN WAR TO THE RISK OF SERIOUS BODILY INJURY.
POINT V
THE COURT ERRED IN PERMITTING THE STATE TO CROSS-EXAMINE THE DEFENDANT IN REGARD TO HIS SILENCE IN FAILING TO DISCLOSE THAT HE HAD FOUND THE PROPERTY IN HIS BACKYARD WHEN BEING QUESTIONED BY DETECTIVE GIAQUINTO IN THE KITCHEN.
POINT VI
THE COURT ERRED IN DENYING DEFENDANT' S MOTION FOR JUDGMENT OF ACQUITTAL IN REGARD TO THE CHARGE OF THIRD DEGREE THEFT BECAUSE THE STATE FAILED TO PROVE THAT THE VALUE OF THE PROPERTY STOLEN FROM MS. WAR EXCEEDED FIVE HUNDRED DOLLARS.
Both defendants contends that the trial judge erred in not granting their motion to suppress the property seized from the home as a result of Nieves's signed consent to search. We disagree. We affirm substantially for the reasons expressed by the trial judge. His findings are supported by the credible evidence in the record. State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).
We decline to discuss Colon's sentencing issue in light of our reversal and remand for a new trial. With respect to his remaining claims, raised pro se or by his counsel, our review of the record convinces us that they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).
With respect to Benitez, he argues in point three that his right of confrontation under the State and Federal Constitutions was violated by the admission into evidence of Colon's oral statement. Benitez relies on State v. Rivera, 351 N.J.Super. 93, 797 A.2d 175 (App.Div.) certif. granted, 174 N.J. 366, 807 A.2d 197 (2002), to support his claim. We disagree.
In Rivera, we decided that an exculpatory statement by a co-defendant which inculpates the defendant "is so inherently unreliable that its admission ... violated defendant's right to confrontation." Id. at 94-95, 797 A.2d 175. The objected to statement here is that when the police questioned Colon, he said that he arrived home at 12:30 p.m. with Benitez. Benitez, however, had an alibi defense and presented a witness who said that he was working at her property until 12:45 or 12:50. Benitez argues that Colon's statements were not admissible statements against Colon's interest under N.J.R.E. 803(c)(25), and that because Colon did not testify, Benitez was denied his right to cross-examine Colon on the statement. These facts differ *562 substantially from Rivera. In Rivera, when the police approached a co-defendant and told him he was under arrest, the co-defendant dropped two bags of drugs to the ground and "suddenly blurted out that the crack was not his, that he was delivering it for Danny Rivera, and that they could speak to Rivera" at a specific location. Id. at 98, 797 A.2d 175. The trial judge there admitted the statement as an excited utterance under N.J.R.E. 803(c)(2). We did not challenge the excited utterance status of the statement but concluded that the statement was insufficiently reliable to be admitted against defendant. We are satisfied that Rivera does not apply here. Colon made no statement directly inculpating Benitez. His statement that he arrived home at 12:30 p.m. with Benitez was simply another factor for the jury to consider in determining credibility.
We have reviewed the record with respect to Benitez's remaining points and, in light of applicable law, conclude that they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

IV
We reverse defendants' convictions and remand for a new trial.
PARKER, J.A.D., dissenting.
I agree with my colleagues that the "record is insufficient to permit [Lillian War's] testimony by way of deposition[,]" and that "there ought to be medical proofs to establish [physical or mental incapacity under R. 3:13-2]." It is the remedy upon which I respectfully disagree.
Rather than reverse defendants' convictions and remand for a new trial, I would remand for a hearing to determine whether War was physically incapacitated to the extent that she was unable to testify before the jury. See, State v. Madison, 109 N.J. 223, 245, 536 A.2d 254 (1988) (holding that rather than reversing the conviction, "the appropriate remedy" for impermissibly suggestive identification procedures "is to remand ... for a taint hearing to determine whether the identifications of [defendant] had an independent source.") If, after a full hearing on the issue, there is sufficient medical evidence to support a finding that War was physically incapacitated to the extent she could not testify, the convictions will stand. If the State is unable to present medical evidence of War's incapacity at the time of her deposition, defendants will be tried anew.[1]
The Confrontation Clause was intended to prevent conviction by deposition or affidavit. Mattox v. U.S., 156 U.S. 237, 244, 15 S.Ct. 337, 340, 39 L.Ed. 409, 411 (1895). It has never been interpreted to guarantee defendants "the absolute right to a face-to-face meeting with witnesses against them at trial." Maryland v. Craig, 497 U.S. 836, 844, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666, 677 (1990). Rather, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence ... by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Id. at 845, 110 S.Ct. 3157. Reliability of evidence is assured by testimony under oath"thus impressing [the witness] with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury;" cross-examination"the greatest legal engine ever invented for the discovery of truth[;]" and observation of the witness's demeanor "thus aiding the jury in assessing his [or her] credibility." California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed. 2d 489, 497 (1970) (citations omitted). *563 While "the Confrontation Clause reflects a preference for face-to-face confrontation at trial," the preference "must occasionally give way to considerations of public policy and the necessities of the case." Craig, supra, 497 U.S. at 849, 110 S.Ct. at 3165, 111 L.Ed.2d at 681 (citations omitted). Where important public policies are at issue and the reliability of the testimony is assured, face-to-face confrontation may give way to alternatives such as testimony by closed circuit television, where the jury and defendant see the witness simultaneously, and defense counsel can freely confer with defendant and rigorously cross-examine the witness. State v. Crandall, 120 N.J. 649, 654-55, 577 A.2d 483 (1990).
As the majority notes, New Jersey law recognizes a number of exceptions to the Confrontation Clause. By statute, child-victim-witnesses may testify by closed circuit television, subject to the requirements of N.J.S.A. 2A:84A-32.4. Where the evidence establishes that (1) testimony by closed-circuit television is necessary to protect the child-victim-witness's welfare; (2) the trial judge is satisfied that the child-victim-witness would be traumatized by the presence of defendant; and (3) the child's emotional distress is more than "mere nervousness or excitement or some reluctance to testify," the child's testimony by closed-circuit television does not offend the Confrontation Clause. Crandall, supra, 120 N.J. at 654-55, 577 A.2d 483 (citations omitted).
We have permitted material witnesses to testify by videotaped deposition when there was sufficient medical evidence to demonstrate that the witness had a heart attack and was at risk for a further cardiovascular incident. State v. Rodriquez, 264 N.J.Super. 261, 273, 624 A.2d 605 (App. Div.1993), aff'd o.b., 135 N.J. 3, 637 A.2d 914 (1994); see also, State v. Washington, 202 N.J.Super. 187, 193, 494 A.2d 335 (App.Div.1985)(holding that the trial court properly granted leave to take a videotaped de bene esse deposition of a victim-witness who suffered from a severe cardiac condition).
Moreover, the New Jersey Constitution articulates a strong policy of protecting crime victims' rights. N.J. Const., art. I, ¶ 22. In the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38, the Legislature declared "that without the participation and cooperation of crime victims and witnesses, the criminal justice system would cease to function." N.J.S.A. 52:4B-35. Among the statutory rights granted to a victim-witness, are the right "[t]o be treated with dignity and compassion by the criminal justice system;" and the right "[t]o be free from intimidation." N.J.S.A. 52:4B-36a and c. By establishing procedural safeguards to allow those incapacitated by age or infirmity to testify by videotaped deposition, crimes against some of the most vulnerable people in our society may be prosecuted, resulting in a strong deterrence against crimes targeting the aged and infirm.
For these reasons, rather than reverse the convictions outright, I would remand the matter for a hearing to determine whether War was physically incapacitated as contemplated by R. 3:13-2. Although she appeared able and cogent in her videotaped deposition and asserted her independence and ability to care for herself after her two prior heart attacks, medical evidence may demonstrate that the stress of testifying before a jury in the presence of defendants would have put her at too great a risk for a reoccurrence. A crime victim should not be subject to unreasonable risks in order to redress the crimes against her.
NOTES
[1] This procedure serves the dual interests of justice and judicial economy. See, e.g., State v. Preciose, 129 N.J. 451, 474, 609 A.2d 1280 (1992).