**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5093-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RAJHADD KILPATRICK,
a/k/a RAJHAAD KILPATRICK,
and RAJHADD S. KILPATRICK,

    Defendant-Appellant.

_____

Submitted January 24, 2022 – Decided February 16, 2022

Before Judges Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-11-3226.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele E. Friedman, Assistant Deputy Public Defender, of counsel and on the briefs).

Grace C. MacAulay, Acting Camden County Prosecutor, attorney for respondent (Hannah M. Franke, Special Deputy Attorney General/Acting Assistant Prosecutor, and Kevin J. Hein, Special

Deputy Attorney General/Acting Assistant Prosecutor,
of counsel and on the brief).

PER CURIAM

Defendant Rajhadd Kilpatrick appeals from a June 10, 2019 judgment of conviction for aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). Defendant pleaded guilty, reserving the right to appeal two pretrial rulings: (1) a June 22, 2018 order denying a motion to suppress his statement to the police; and (2) a July 25, 2018 order denying a motion to exclude an out-of-court identification by a non-eyewitness and conduct a Wade[1] hearing. We affirm.

We recite the facts stated in the motion judge's June 20, 2018 decision on the record and June 22, 2018 written decision denying defendant's motion to suppress his statement. The judge's decisions incorporate the testimony of Detective Michael Sutley of the Camden County Prosecutor's Office (CCPO) during an evidentiary hearing on the suppression motion. Additional facts are taken from the motion judge's July 25, 2018 oral decision denying defendant's motion to preclude an out-of-court identification by a non-eyewitness.

In October 2016, defendant robbed an individual at gunpoint near a bar in Camden. The robbery was captured on a surveillance camera. After the robbery,

---

[1] U.S. v. Wade, 388 U.S. 218 (1967).

A-5093-18

the surveillance video showed defendant and two individuals walking down the block and out of camera range. About a minute later, Jamir Syms was shot and killed near the location of the robbery. The surveillance video did not capture the shooting.

In a statement to the police, the robbery victim identified defendant. According to the victim, three individuals robbed him and then attempted to rob Syms. The robbery victim saw defendant shoot Syms.

The police released still images of the individuals captured on the surveillance video to the media and asked the public to help identify the men. On January 10, 2017, Emir Blackward contacted the police, stating he could identify one of the suspects from the images. Blackward explained he knew defendant as "Rah" and had been friendly with Rah Rah for two years. Blackward identified defendant not only from the still images released to the media, but also in a separate photograph shown to him by Detective Sutley and in the surveillance video itself.

The police arrested defendant on January 14, 2017, charging him with armed robbery and felony murder. About an hour after his arrest, Detective Sutley and another detective from the Camden County Metro Police Department questioned defendant. The detectives told defendant that he was charged with

3

murder. Detective Sutley then read the criminal complaint to defendant. The complaint stated, "while engaged in the commission of an armed robbery [defendant] cause[d] the death of Jamir Syms who was not a participant in said armed robbery."

Detective Sutley informed defendant of footage from a surveillance video recorded the night of the shooting. Before playing the video, the detective stated he was required to advise defendant of his Miranda[2] rights. Detective Sutley then read the Miranda warnings, ensuring defendant understood his rights. Defendant initialed each question and signed his name on the Miranda form. After signing the form, Sutley asked defendant if he understood his rights, wished to waive those rights, and wanted to speak with the police. Defendant responded he understood his rights and agreed to waive them.

After defendant waived his rights, the detectives played the surveillance video, stopping at various times to ask defendant questions.[3] Based on the video, the detectives told defendant they believed three suspects robbed a victim and then walked out of the camera's view. The detectives asked defendant what

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] The motion judge reviewed the video recording of defendant's statement to the police. We reviewed the recording as well.

4

happened when he and the other men turned the corner, beyond the view of the camera, and proceeded toward the location where Syms was shot. Defendant denied any involvement in the Syms shooting.

At times during the detectives' questioning, defendant stated he did not want to answer the question or did not want to talk about a particular subject. Despite his statements, defendant continued his dialogue with the detectives throughout the interview. For example, defendant repeatedly told the detectives, "[l]et me tell you something man," and "nah, look look listen, nah, look listen." Defendant uttered these statements during the questioning as part of his effort to convince the detectives he had nothing to do with the Syms shooting. Defendant even directed questions to the detectives, such as "[w]here do you see him pull a gun out?", "[s]o, why am I not charge[d] with robbery?", and "[y]ou feel me?", demonstrating defendant's desire to engage in further discussions with the detectives. In fact, when the detectives left the room, defendant called for them to return, knocked on the door, saying "[c]ome here yo'," and asked for "two more seconds of your time bro."

During the questioning, defendant believed he was at the CCPO to view a surveillance video and learn the charges against him. He appeared unaware he was charged with felony murder.

A-5093-18

On June 20, 2018, the pretrial judge conducted an evidentiary hearing on defendant's motion to suppress his statements to the detectives. Defendant argued he invoked his right to terminate the interrogation and the detectives refused honor that request.

The judge issued a sixteen-page written decision finding defendant did not invoke his right to terminate the interrogation, remain silent, or request the presence of counsel during the interrogation. Based on Detective Sutley's testimony and her review of the videotaped statement, the judge concluded defendant freely and voluntarily waived his rights before speaking with the detectives. She found defendant mentioned the term "lawyer" but never indicated he wished to speak with a lawyer to unambiguously assert his right to have counsel present during the questioning.

The judge also rejected defendant's claimed invocation of his right to remain silent under the totality of the circumstances, reviewing each statement uttered by defendant purportedly evidencing his termination of the questioning. The judge provided a detailed explanation why each statement cited by defendant did not constitute an invocation of the right to terminate the interrogation or the right to remain silent.

A-5093-18

The judge concluded defendant's "asking Det[ective] Sutley about [the] charges and indicating that he did not want to say anything 'wrong,' . . . was not 'clearly and unequivocally' indicating that he wished to stop speaking with Det[ective] Sutley altogether." The judge also found "[d]efendant continued to engage Det[ective] Sutley in conversation and gave no indication that he wanted the conversation to terminate." According to the judge, by asking Detective Sutley questions that required the detective to respond, defendant failed to clearly and unequivocally express his wish to terminate the questioning.

The judge also found defendant's initiation of conversation with Detective Sutley contrary to his claimed invocation of the right to remain silent. In fact, after watching the recorded statement, the judge described defendant as "one of the most talkative defendants [she has] ever seen in a statement. He is anxious to talk . . . he is demanding and makes suggestions to the interviewers as to what they should be showing him and what they should be doing."

After his unsuccessful motion to suppress his statement to the detectives, defendant filed a motion to preclude the admission of the out-of-court identification by a non-eyewitness and requested a Wade hearing. Defendant sought to suppress Blackward's out-of-court identification based on evidence of

7

suggestiveness, the low-quality images in the video surveillance, and failure to properly record the identification.

In a July 25, 2018 oral decision, the judge denied the motion. The judge reviewed the transcript of the detectives' interview with Blackward. She concluded Blackward was unaware "of the defendant's identity at the time the photographs were shown" and, therefore, the procedure was "the equivalent of a blind fashion," adding to the reliability of the identification process.

Although Detective Sutley failed explain Blackward was not compelled to make an identification from the photographs, the judge found "there [was] no indication that this omission by Detective Sutley increased the risk of mis-identification . . . ." Before Detective Sutley even asked Blackward any questions about the photographs, the judge noted Blackward "immediately volunteered that he recognized the defendant from the photograph and that he had become familiar with the photograph prior to the lineup due to its previous release to the media."

The judge also cited Blackward's positive identification of defendant in the second and third photographs from the lineup. Before showing Blackward a third photograph, Detective Sutley said, "Hold on one second. I'm gonna show you one more picture, and just because I'm showing you a picture, I'm not saying

that I know who the person is . . . or anything else. I just want to show you the picture. Just let me know if you recognize this person." Blackward confirmed he knew the man depicted in the third photograph as Rah Rah. Blackward "stated the photographs were unequivocally of the defendant." Applying the factors in State v. Henderson[4] and reviewing the photographs presented to Blackward, the judge concluded defendant "failed to demonstrate evidence of suggestiveness under [the] system variable[s] outlined [in Henderson]."

Regarding the recording of Blackward's confidence in his identification, the judge explained there was no indication "Blackward was advised of the defendant's identity prior to the proceeding or was otherwise coached as argued by the defendant." The judge found Blackward confirmed the identity of defendant three separate times during his interview with the detectives. In reviewing the transcript of Blackward's interview, the judge noted "Blackward repeatedly emphasize[d] his certainty of the identification of the defendant in the photographs . . . ." Absent a finding of any suggestiveness in Blackward's identification of defendant, the judge concluded a Wade hearing was not warranted.

---

[4] 208 N.J. 208 (2011).

A-5093-18

After denial of his pretrial motions, defendant pleaded guilty to an amended charge of aggravated manslaughter.

On appeal, defendant raises the following points:

POINT I

THIS COURT SHOULD REVERSE THE MOTION COURT'S ORDER DENYING THE MOTION TO SUPPRESS THE CUSTODIAL STATEMENT BECAUSE THE STATE FAILED TO PROVE MR. KILPATRICK VALIDLY WAIVED HIS MIRANDA RIGHTS, AND THE DETECTIVES DID NOT SCRUPULOUSLY HONOR MR. KILPATRICK'S REPEATED INVOCATIONS OF HIS RIGHT TO SILENCE. (Raised Below, in Part).

A. The State Failed to Meet Its Burden of Proving that Mr. Kilpatrick Knowingly and Intelligently Waived His Miranda Rights Beyond a Reasonable Doubt, Because the Detectives Failed to Apprise Mr. Kilpatrick of His True Status, and It Is Clear From the Record that Mr. Kilpatrick Believed He Was Not There For Questioning.

i) Throughout the Interrogation, Police Repeatedly Told Mr. Kilpatrick That He Was Not Charged With Robbery, Even Though Robbery is an Indispensable Component of Felony-Murder, Without Which, the Overarching Felony-Murder Could Not Have Been Proven. In Addition, Police Told Mr. Kilpatrick He Was Charged With "Murder," Rather than "Felony-Murder," and Only Mentioned "Felony-Murder" Well After Asking If He Sought to Waive His Rights.

ii) Any Ostensible Waiver Was Not Knowing and Intelligent, Since Mr. Kilpatrick's Own Words During

10

the Interrogation Show He Did Not Understand He Was There for Questioning.

B. The Detectives Failed to Scrupulously Honor Mr. Kilpatrick's Repeated Invocations of His Right to Silence.

POINT II

THE MOTION COURT COMMITTED REVERSIBLE ERROR IN DENYING THE MOTION FOR A WADE HEARING AND RULING THAT THE NON-EYEWITNESS IDENTIFICATION EVIDENCE WAS ADMISSIBLE AT TRIAL.

A. Identifications Made From Low-Quality Images by Someone Who Did Not Actually See an Event Should Not Be Admitted Into Evidence.

i) Mr. Blackward Would Be in No Better Position Than a Jury to Identify Mr. Kilpatrick From Surveillance Footage and Photographs.

ii) A Witness's Familiarity With A Person Does Not Cure The Problem.

iii) A Face That Cannot Be Clearly Seen Cannot Be Identified.

B. The Defense Was Entitled to a Wade Hearing, Because the Defense Proffered Some Evidence of Suggestiveness that Could Have Led to a Mistaken Identification and the Initial Out-of-Court Conversation Pertaining to the Identification Was Not Properly Recorded.

(i) The Defense Proffered Some Evidence of Suggestiveness, So As to Trigger a Wade Hearing.

11

(ii) Mr. Blackward's Initial Out-of-Court Conversation About the Identification Was Not Properly Recorded, in Contravention of the Spirit of Rule 3:11, State v. Anthony, and State v. Delgado.

Our review of a trial judge's findings at an evidentiary hearing is deferential. See State v. Tillery, 238 N.J. 293, 314 (2019); State v. Hubbard, 222 N.J. 249, 262-65 (2015). "When faced with a [challenge to a] trial [judge]'s admission of police-obtained statements, [we] engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. Hreha, 217 N.J. 368, 381-82 (2014) (quoting State v. Pickles, 46 N.J. 542, 577 (1966)). "Subject to that caveat, [we] generally will defer to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record." State v. L.H., 239 N.J. 22, 47 (2019). This deference extends to a judge's determination based not only on live testimony but also based on the judge's review of video or documentary evidence because of the judge's "expertise in fulfilling the role of factfinder." State v. S.S., 229 N.J. 360, 364-65, 379-80 (2017).

Our review of denial of a motion to suppress a statement following an evidentiary hearing is limited. In reviewing a trial judge's determination on a motion to suppress a statement, we similarly defer to the trial judge's factual

12

findings, State v. Sims, 466 N.J. Super. 346, 362 (App. Div. 2021), certif. granted, 246 N.J. 146 (2021) (citing Tillery, 238 N.J. at 314), "because the trial court has the 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'" Id. at 362-63 (quoting S.S., 229 N.J. at 374). Factual findings by a trial judge will be disturbed only when the findings are not supported by sufficient credible evidence in the record. State v. Hagans, 233 N.J. 30, 37 (2018). We review the trial judge's legal determinations de novo. Id. at 38.

Applying these principles, we first consider defendant's argument the judge erred in denying the motion to suppress his statements to the detectives because he did not know his true status regarding the charges against him. He also claims the detectives misinformed him regarding the armed robbery charge during the interrogation. As a result, defendant asserts he did not knowingly and intelligently waive his Miranda rights. We disagree.

Defendant claims the detectives violated his Fifth Amendment rights by not telling him he was arrested for felony murder and armed robbery before he waived his rights. Defendant further contends he did not understand he was brought to the CCPO for questioning. According to defendant, such disclosures were constitutionally required to enable him to knowingly, voluntarily, and

intelligently waive his Fifth Amendment right against self-incrimination in accordance with State v. Vincenty, 237 N.J. 122 (2019), State v. A.G.D., 178 N.J. 56 (2003), and Sims.

Under New Jersey law, a person under arrest is "to be informed of the charge for which he [is] being placed under arrest[.]" Sims, 466 N.J. Super. at 367. If these procedures are not followed, the waiver may be invalidated. See A.G.D., 178 N.J. at 68. Prior to a custodial interrogation, the police are required to inform a defendant of the specific charges filed before waiving his or her Miranda rights. See Vincenty, 237 N.J. at 132-34; A.G.D., 178 N.J. at 63. In Sims, we held the same requirements applied to a defendant arrested and questioned prior to the formal filing of charges. Sims, 466 N.J. Super. at 367.

Defendant's reliance on these cases is misplaced. Here, defendant was formally charged prior to the interrogation. It is undisputed Detective Sutley read the complaint to defendant prior to issuing the Miranda warnings, informing defendant he was arrested for armed robbery and murder. The complaint stated defendant was charged with causing the death of Syms while "engaged in the commission of an armed robbery." The charges, as read, included the definition of felony-murder based on the armed robbery, and cited

14

the relevant statute, N.J.S.A. 2C:11-3(a)(3). Defendant even told the detectives he understood the meaning of the term "felony-murder."

Detective Sutley also explained the need to provide the written Miranda warnings before he could ask defendant any questions. The Miranda form referred to "questions" and "questioning" several times. When asked if he understood each statement mentioning "questions" or "questioning" by the detectives, defendant responded "yes." Thus, defendant knew his presence at the CCPO involved being questioned by the detectives.

Based on Detective Sutley's reading of the complaint, defendant was fully aware of his true status and the charges against him prior to waiving his Miranda rights. Additionally, in stating he understood the Miranda procedure, defendant acknowledged the detectives would question him. Under the circumstances, the judge properly ruled defendant's statements to the detectives were admissible.

Defendant also argues he invoked his right to remain silent and the detectives failed to scrupulously honor that right, warranting suppression of his statement. We disagree.

The right against self-incrimination is "[o]ne of the must fundamental rights protected by both the Federal Constitution and state law." State v. O'Neill, 193 N.J. 148, 167 (2007). Among those rights, is the right to remain silent.

<u>Miranda</u>, 384 U.S. at 444. A defendant's invocation of the right to remain silent "however ambiguous . . . must be diligently honored." <u>S.S.</u>, 229 N.J. at 382 (quoting <u>State v. Bey</u>, 112 N.J. 123, 142 (1988)).

A defendant need not use any "talismanic words" or phrases to invoke the right to remain silent. <u>Id.</u> at 383. Words used by a defendant are viewed in "the full context in which they were spoken." <u>State v. Roman,</u> 382 N.J. Super. 44, 64 (App. Div. 2005). If the police are uncertain whether a suspect has invoked his right to remain silent, "two alternatives are presented: (1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his right to silence." <u>S.S.</u>, 229 N.J. at 383. A defendant who has "nothing else to say" or "does not want to talk about the crime" has asserted the right to remain silent, requiring the police immediately to stop questioning. <u>State v. Johnson</u>, 120 N.J. 263, 281 (1990).

However, the police are not required to accept "any words or conduct, no matter how ambiguous, as a conclusive indication that a suspect desires to terminate questioning." <u>Bey</u>, 112 N.J. at 136-37. "When the defendant's statement or conduct do not indicate that he is invoking his right to silence, that statement or conduct does not constitute an invocation of the right." <u>Id.</u> at 137. New Jersey courts use a "totality of the circumstances approach that focuses on

16 <span style="float:right">A-5093-18</span>

the reasonable interpretation of defendant's words and behaviors" to determine whether a defendant invoked the right to remain silent. State v. Diaz-Bridges, 208 N.J. 544, 564 (2012); see also State v. Maltese, 222 N.J. 525, 545 (2015) (stating a "defendant's statement is evaluated in the full context in which the statement is made").

After reviewing the record, including the videorecording of defendant's questioning, defendant never unequivocally invoked the right to remain silent. On the videotape, it is clear defendant wanted to talk to the detectives and affirmatively continued his conversation with them. His statements were not invocations of the right to remain silent. The instances where defendant claimed to have invoked the right to remain silent were either denials of guilt by defendant or refusals to answer specific questions posed by the detectives. Even then, it is obvious from the record, defendant asked the detectives follow-up questions despite his purported invocation of the right to remain silent.

At one point during the interrogation, defendant stated, "That's it – I don't even want to talk no more." Given defendant's propensity to continue asking questions throughout the interrogation, Detective Sutley found this statement ambiguous. Where an invocation of the right to remain silent is ambiguous, the

A-5093-18

officer may ask clarifying questions to determine whether the defendant intended to invoke the right to remain silent. Johnson, 120 N.J. at 283.

Detective Sutley appropriately asked a clarifying question about defendant not wanting to talk anymore. The detective asked, "You don't want to talk no more?". Defendant responded:

> Nah, man because, man – (inaudible) what – (inaudible) fuck it – I ain't got nobody else to talk to. So, fuck it bro. Is life bro – put it to your like this bro – I ain't kill[ed] the little nigga – man to man bro – me and you bro. Man, I already know you gonna be there – going through my case with me and shit and you going to see that I ain't killed the nigga. You feel me? Robbery – shit – I ain't robbed him. Let that nigga say I robbed him. You feel me? Like let him come to court and say I robbed him. Is on camera – (inaudible) will I still supposedly get charged with it? Just because, is on camera?

Here, Detective Sutley stopped questioning defendant and asked a clarifying question. Defendant's response to the clarifying question distinctly indicated he was not invoking his right to remain silent. To the contrary, defendant's statement demonstrated a desire to continue speaking with the detectives because, as defendant explained, "I ain't got nobody else to talk to."

We are satisfied the judge thoroughly considered and weighed each statement where defendant claimed to have invoked his right to remain silent. In deferring to the judge's findings regarding each statement, as well as our own

18

review of defendant's statements after viewing the videorecorded statement, there was ample evidence to support the judge's finding defendant did not invoke his right to remain silent and properly denied defendant's motion to suppress his statement.

Having reviewed the record, defendant knew his true status and charges against him prior to questioning. Defendant also understood his <u>Miranda</u> rights and voluntarily, knowingly, and intelligently waived those rights. Defendant did not invoke his right to remain silent or speak with an attorney. Therefore, the judge correctly concluded defendant's statements were admissible.

We next consider defendant's argument the judge erred in denying his request for a <u>Wade</u> hearing and admitting as evidence an identification by an individual who did not witness the shooting. Again, we disagree.

We review denial of a request for a <u>Wade</u> hearing for abuse of discretion. <u>State v. Henderson</u>, 208 N.J. 208, 290-91 (2011). We will uphold a trial judge's admission of an out-of-court identification if "the findings made could reasonably have been reached on sufficient credible evidence present in the record." <u>State v. Wright</u>, 444 N.J. Super. 347, 356 (App. Div. 2016) (quoting <u>State v. Johnson</u>, 42 N.J. 16, 162 (1964)).

To obtain a <u>Wade</u> hearing, a defendant must "proffer . . . some evidence of impermissible suggestiveness," which could lead to a mistaken identification. <u>Henderson</u>, 208 N.J. at 238 (quoting <u>State v. Rodriguez</u>, 264 N.J. Super. 261, 269 (App. Div. 1993)). If a defendant presents sufficient evidence of impermissible suggestiveness, the court should conduct an evidentiary hearing where the State must offer proof the proffered eyewitness identification is reliable based several variables. <u>Id.</u> at 288-89. However, "the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification." <u>Id.</u> at 289.

Our Supreme Court has noted a <u>Wade</u> hearing is not required for a "confirmatory" identification because such an identification "not considered suggestive." <u>State v. Pressley</u>, 232 N.J. 587, 592 (2018). "A confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name." <u>Id.</u> at 592-93 (citing National Research Council, <u>Identifying the Culprit: Assessing Eyewitness Identification</u> 28 (2014)). The Court explained the person identified "may be a neighbor or someone known only by a street name." <u>Id.</u> at 593 (citing <u>Identifying the Culprit</u>, at 22).

Here, the judge determined Blackward's identification of defendant was confirmatory and therefore lacked any risk of suggestiveness or misidentification. She found Blackward identified defendant three separate times during his interview with the CCPO detectives, emphasizing "his certainty of the identification of the defendant in the photographs . . . ." She concluded Blackward had sufficient familiarity with defendant to confirm defendant's identity from the photographs.

Blackward told the detectives he did not know defendant's real name but knew defendant went by the name Rah Rah. Blackward also said he knew defendant for about two years. Additionally, Blackward was familiar with the way defendant walked and carried himself as depicted in the surveillance video footage. Blackward said defendant walked with a limp because defendant recently shot himself.[5]

We are satisfied there was sufficient evidence in the record to support the judge's conclusion that Blackward's identification of defendant was a "confirmatory identification" and, therefore, did not present "a very substantial likelihood of irreparable misidentification." Pressley, 232 N.J. at 592; see also

---

[5] Blackward's statement was consistent with defendant's statement to the detectives. During the detectives' questioning, defendant confirmed he suffered a foot injury.

Henderson, 208 N.J. at 289.  On these facts, the judge correctly denied defendant's motion for an evidentiary hearing on Blackward's out-of-court identification.

To the extent we have not addressed any of defendant's arguments, we conclude the arguments are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION